Affirmed and Opinion filed November 17, 2005









Affirmed and Opinion filed November 17, 2005.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00244-CR

____________

 

SUSAN LUCILLE WRIGHT, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 263rd
District Court

Harris County, Texas

Trial Court Cause No. 937,134

 



 

O P I N I O N

Susan Lucille Wright was accused of murdering her husband,
Jeff Wright, whose body was found with almost 200 stab wounds.  Appellant admitted that she inflicted all the
stab wounds, but claimed she began stabbing her husband in self-defense.  The State argued that she planned the murder
and, to underscore that point, two prosecutors staged an in-court demonstration
on the couple=s bed to show how appellant would have
accomplished the murder.

 








A jury found appellant guilty of first-degree murder in the
death of her husband, and assessed her punishment at twenty-five years= confinement in
the Texas Department of Criminal Justice, Institutional Division.  Appellant=s primary issue on
appeal is that the trial court erred in permitting the prosecution to stage an
in-court demonstration of its theory of how Jeff Wright died, because it caused
the jurors to confuse high drama with reality. 


Appellant claimed her husband raped her and then threatened
to kill her with a knife.  Hearing the
threat, appellant struggled with Jeff Wright for the knife and, during the
struggle, stabbed him.  Thus, appellant
claims she began acting in self-defense. 
The State, on the other hand, claimed appellant seduced her husband,
tied his arms and legs to the bed as part of the seduction, and then murdered
him.  The in-court demonstration showed
where and with what appellant tied her husband and the location of the knife
wounds.

Appellant=s argument
regarding the demonstration seems to be that, if the State has no eyewitnesses
to the event, Rule 602 of the Texas Rules of Evidence prevents the State from
staging the demonstration because its witness would have no personal knowledge
of the staged events.  We hold
that the demonstration was based on two types of valid testimony: (1) testimony about which the witness
did have personal knowledge; and (2) lay opinion testimony presenting
reasonable inferences from the evidence of which the State=s witness had personal
knowledge.  See Tex. R. Evid. 602, 701. 


This valid testimony revealed a theory of the crime deduced
from the crime scene itself and the many clues available at the sceneCincluding the
deceased=s body, its many
wounds, the bed, and the ligatures, or bindings, on the arms and ankle.  Because the demonstration was based on
evidence and accurately portrayed that evidence, the trial court did not abuse
its discretion in allowing it.  In
addition, we conclude that the demonstration was not unfairly prejudicial to
appellant.  We also overrule appellant=s other issues
concerning alleged error (1) in the trial court=s refusal to hold
a hearing on appellant=s motion for new trial, and (2) in the
prosecutor=s arguments to the jury.  As a result of these rulings, we affirm the
trial court=s judgment.








Factual
Background

Appellant was married to Jeff Wright.  On Saturday, January 18, 2003, officers from
the Harris County Precinct 4 Constable=s Office
investigated a report of a dead body in the yard of the Wright home.  In the backyard, they discovered Jeff Wright=s partially-buried
body in a shallow hole next to a patio. 
The officers also found a mattress, box springs, comforter and headboard
in the backyard.  The mattress was soaked
with blood.  Inside the home, one wall of
the master bedroom had been freshly painted and a piece of the carpet had been
cut out; painting supplies, a box cutter, and scissors were found in the
room.  Blood spatters were seen on the
curtains and other items in the bedroom. 
A receipt for two gallons of bleach, bleach-stained size 6 jeans, and a
towel also were found.

The medical examiner concluded Jeff Wright died of multiple
sharp-force injuries.  He had been
stabbed at least 193 times.  Among these
injuries, Jeff suffered 41 stab wounds to his face, 23 to his neck, 46 to his
chest, 22 to his abdomen, 7 to his pubic region, including a superficial cut on
his penis, 19 to his legs, 23 to his arms and hand, and one to his back.  The tip of a knife was broken off in the top
of his skull.  Jeff Wright=s body was found
nude, but he had what were described as Aligatures@ on his arms and
one leg; specifically, tied around each wrist was a necktie, and tied around
the right ankle was what appeared to be a part of a bathrobe sash.  Candle wax was found on Jeff Wright=s thigh and
scrotum.  It was later determined that
Jeff Wright had been killed on January 13, 2003, five days before his body was
found.  Appellant was charged with his
murder and, in early 2004, her trial began.

Opening
Statements








In its opening statement at trial, the State told the jury
that appellant killed her husband rather than seek a divorce, and that she
sought to gain from a recently-acquired $200,000 insurance policy on Jeff
Wright=s life.  According to the State, on the night Jeff was
killed, appellant undertook an elaborate plan to seduce him so that, in
anticipation of lovemaking, he would allow her to tie him to their bed.  Once Jeff was tied up and defenseless,
appellant emerged with a knife and, with unfathomable anger, brutally stabbed
him over and over again.  Then, in the
week that followed, appellant buried Jeff=s body in the
backyard, worked to cover up the evidence of her crime, and began a campaign of
Alies and
fabrications,@ telling Jeff=s family and
friends that Jeff had hit their son, abused her, and left home.  As part of her plan, appellant also reported
physical abuse to her doctor and filed criminal charges against Jeff, resulting
in a warrant being issued for his arrest. 
It was only after the family dog dug up Jeff=s body, the State
concluded, that appellant=s plan fell apart.

In sharp contrast, the defense=s opening
statement countered that appellant acted in self-defense.  Jeff Wright had emotionally and physically
abused appellant throughout their marriage, and the reason she did not leave
him was that she was afraid he would kill her. 
On the night of his death, Jeff had come home under the influence of
cocaine and hit their son in the face. 
When appellant told him he needed help for his rage issues, he became
violent.  He threw appellant on their
bed, forcibly raped her, and threatened to kill her with a knife.  Appellant struggled with him for the knife,
got it away from him and stabbed him with it several times.  At that point, appellant suffered a break
from reality.  She tied one of Jeff=s hands to the
bed, and continued stabbing in a panic that he would come back to life.  Over the following week, in her delusional
state, appellant continued to believe Jeff was still alive.  The number of stab wounds found on Jeff=s body, the defense
concluded, evidenced her fear, not a premeditated, cold-blooded killing.

The
In-Court Demonstration








After calling several witnesses to explain how Jeff=s body was located
and what the police officers found at the Wright home, lead prosecutor Kelly
Siegler sought to bring in the Wrights= blood-stained bed
and set it up in the courtroom to demonstrate the State=s theory of the
case for the jury.  Defense counsel, Neal
Davis, objected to the demonstration as not based on personal knowledge,
speculative, and too highly prejudicial. 
The trial court ruled that it would allow the State to Aproduce whatever
reenactment they wish, as long as the proper predicate has previously been laid
to show there is some basis in fact for the demonstration as you wish to
portray it.@ 

Ms. Siegler called to the witness stand Detective Mark
Reynolds of the Harris County Sheriff=s Department,
Homicide Division.  As the lead detective
assigned to the case, Detective Reynolds had witnessed Jeff=s body being
unearthed, and later was present for the autopsy.  Ms. Siegler asked Detective Reynolds a series
of questions concerning the investigation, including these questions about the
condition of Jeff Wright=s body:

The State:    (Ms. Siegler) The large majority of the wounds that you saw on
Jeffrey Wright=s body were on the front or on the
back?

Witness:      (Detective Reynolds) On the front.

The State:    Consistent with him being tied up which way, sir?

Witness:      Faceup.

Defense:      (Mr. Davis) Objection, Your Honor.  That=s speculation about being tied up.  This witness has no personal knowledge to be
able to testify about that.

The Court:    That=s overruled.

After
some additional questioning, the State prepared to present the
demonstration.  Defense counsel renewed
his objections, which the trial court overruled.[1]  The bed frame, mattress, and box springs from
the Wright home were then admitted into evidence without objection for the
State=s proposed
demonstration.








What followed is summarized from the trial transcript.  Ms. Siegler began by having Detective
Reynolds confirm that she and appellant were approximately the same weight and
were both about five feet, three to five inches in height.  Ms. Siegler next established that a
prosecutor from her office, Paul Doyle, was approximately the same height and
weight as Jeff Wright, based on Detective Reynolds= testimony that
Jeff was six feet, two inches in height, and weighed 220 pounds.  Ms. Siegler then presented two neckties and
two bathrobe sashes that Detective Reynolds confirmed were similar to those he
saw used as ligatures on Jeff Wright=s body.  Before the demonstration commenced, defense
counsel took Detective Reynolds on voir dire. 
Reynolds admitted that he was not present on the night of the alleged
incident, and the only person who was in the bedroom that night besides the
deceased was appellant.  Reynolds also
did not know exactly where on the bed Jeff Wright was tied.

The State then began the demonstration.  Ms. Siegler instructed Mr. Doyle to lie down
with his back on the bed, his head at the headboard, and his feet at the
footboard.  Next, she instructed
Detective Reynolds to step down from the witness stand and tie one of the
neckties to Mr. Doyle=s left wrist.  Ms. Siegler asked Detective Reynolds this
question:

The State:    (Ms. Siegler) Okay.  And if
[the necktie] were tied to a bed, it would be tied similar to what, in your
opinion?

Witness:      (Detective Reynolds)
Speculate, I guess.  That a B  

Defense
counsel objected that the testimony, by Reynolds= own admission,
was based on speculation.  In response,
the trial court stated, AWell, the Jury should understand that as
far as the exact location as to where and if this ligature was tied to the bed,
that=s not being
presented as the exact spot; is that correct?@  Ms. Siegler acknowledged that was correct,
and proceeded to have Detective Reynolds tie both of Mr. Doyle=s wrists to the
bed.  

Ms. Siegler next sought to have Mr. Doyle=s ankles tied to
the bed with the two bathrobe sashes. 
Over the defense=s objections, one ankle was tied, but when
Ms. Siegler instructed Detective Reynolds to tie the other ankle, defense
counsel objected that only one sash was recovered and argued that Athis is just
theatrics.@  In
response, the trial court commented that there was no evidence of a second
sash.  Ms. Siegler then instructed Detective
Reynolds to remove the sash from one ankle.

Continuing, Ms. Siegler got on top of Mr. Doyle on the bed,
holding a knife, andCwhile questioning Detective ReynoldsCdemonstrated the
State=s theory that,
while Jeff Wright was tied to the bed, appellant straddled him and stabbed him
repeatedly:








The State:    (Ms. Siegler) All right.  

So, if -- if the defendant were to get up on top of
Jeffery [sic] Wright, something like this, and straddle him, and she=s right-handed -- and how do you
think she held the knife?

Put it in my hand.

Defense:      (Mr. Davis) This is just total speculation. 

* * *

The Court:    Excuse me.  If you=d go into a little more questions
with the witness as to how he comes to the conclusion as to how the knife was
held.

The State:    Yes, sir. 

Based on the injuries you saw and the direction of
the cuts, tell the Jury why you believe . . . the knife was held that way in my
hand?

Witness:      (Detective Reynolds) The locations or the injuries themselves
are slicing and they=re, >em, top to bottom lengthwise.  The length is greater than the width, to tell
me that the blade was parallel with the body. 


The State:    And otherwise -- in other words, vertical instead of horizontal?

Witness:      I guess a good way to say it, vertical.  

The State:    That would be consistent with the knife going in this way,
vertical, not this way, horizontal?

Witness:      Correct.

The State:    Is it a more natural fit in your hand to do it this way, as
opposed to this way?

Witness:      Yes.

The State:    Okay.  So if I=m on top of Paul, and I=m holding the knife this way in my
right hand and I attack the head area first, which side of his face are most of
the injuries going to be on?

Witness:      On the left side.

* * *

The State:    Okay.  And most of the
injuries were where?

Witness:      Concentrated to the
left side of the head.








Ms. Siegler, still
Astraddling@ Mr. Doyle on the
bed, then moved from the head to the penis:

The State:    (Ms. Siegler) Do you recall the photographs of the injuries in
the area of his penis?

Witness:      (Detective Reynolds) Yes.

The State:    Okay.  If I wanted to do
stab areas, stab movements to his penis, did you see anything consistent with a
stab to the penis?

Witness:      Not to the penis itself, no.

The State:    Because you saw what?

Witness:      It was nicked.  It was a
superficial cut instead of a slicing.

The State:    Superficial slicing, like this?

Witness:      Yes.   

Turning to the injuries on the legs,
Detective Reynolds testified that he did not believe it was possible that the
attacker could make those wounds while straddling the body.  Instead, he testified that it would be more
consistent with the attacker being on the side of the body.  Apparently dismounting Mr. Doyle and standing
next to him as she continued the demonstration, Ms. Siegler asked, ALike I am right
now?@  Detective Reynolds answered, AYes.@  Ms. Siegler then turned her attention to the
chest area, where most of the wounds on Jeff Wright=s body were
concentrated, and made stabbing motions toward Mr. Doyle=s chest with the
knife.[2]









Next, at defense counsel=s request, Ms.
Siegler and Mr. Doyle demonstrated Mr. Doyle=s limited ability
to move his hands and feet as Ms. Siegler sat on top of him holding the knife.[3]  Then, in order to avoid having to re-tie Mr.
Doyle to the bed, defense counsel was permitted to cross-examine Detective
Reynolds concerning the demonstration. 
Counsel asked Reynolds about a stab wound on Jeff Wright=s back near the
shoulder and some wounds on the back of his leg.  Reynolds refused to agree with counsel that
the stab wound to the shoulder area could not have been made while Wright was
tied up, but conceded that the injuries on the back of Wright=s leg were stab
wounds.  

Finally, Ms. Siegler sought to portray the
Ahypothetical facts@ of appellant=s self-defense
claim as stated in defense counsel=s opening
statement in an attempt to discredit her claim. 
After the trial court sustained several objections to Ms. Siegler=s questions to
Detective Reynolds, Ms. Siegler concluded her demonstration and the court
recessed for lunch while the bed was disassembled.

Appellant=s Testimony








Appellant testified that on the evening of
January 13, 2003, Jeff Wright came home from a boxing lesson with red, glassy
eyes and was extremely agitated.  After
hitting their son in the face when he refused to box, Jeff took a shower.  When he came into their bedroom wearing a
towel, appellant told him that unless he got help with his drug abuse and
anger, she Acouldn=t take anymore.@  Jeff 
became angry, and threw appellant down, kicked her, and sexually
assaulted her.  Appellant closed her eyes
during the sexual assault, Alike [she] always
did@ when he forced
her to have sex.  

When appellant felt Jeff get back on top
of her, she heard him say, ADie, bitch,@ and when she
opened her eyes, she saw a knife in his right hand.  She grabbed the knife, and as it came down,
it hit her left knee, drawing blood.  Her
leg jerked up and hit Jeff in the groin. 
Because she Adidn=t want to die,@ appellant found
the strength to get the knife and push him off her.  She stabbed Jeff in the neck, and as he
fought with her for the knife, she stabbed him again, this time deep in the
chest.  Terrified that he would get the
knife back and kill her, she could not stop stabbing him.  Appellant stopped when the couple=s young son
knocked on the bedroom door.  She tied
Jeff=s right arm to the
bed to keep him from getting up while she put her son to bed.  Still terrified that Jeff was alive and was
going to kill her, appellant returned to the bedroom and continued to stab him
repeatedly.  When she finally stopped,
appellant tried to get Jeff=s body out of the
house.  But, when she tried to drag him,
his head and shoulder hit the nightstand, causing a candle to fall off the
nightstand onto him.  Appellant then tied
him to a dolly by the ankles and left arm and pushed the dolly out to the
patio. 

I.        Issues on Appeal








On appeal, appellant raises seven issues,
contending the trial court erred by (1) permitting the in-court demonstration
in violation of Texas Rule of Evidence 602, (2) permitting the in-court
demonstration in violation of Texas Rule of Evidence 403, (3) denying appellant
a hearing on her motion for new trial,[4]
(4) overruling appellant=s objection to the State=s reference to
punishment during final argument in the guilt-innocence stage of the trial, (5)
overruling appellant=s objection to the State=s final argument
in the punishment phase when the prosecutor urged jurors to pound the jury room
wall with their fists during deliberations, (6) overruling appellant=s objection to the
State=s final argument
in the punishment phase when the prosecutor told the jury that Jeff Wright=s parents Awould stand up
right now and let God take them if it would bring Jeffrey back,@ and (7)
overruling appellant=s objection to the State=s final argument
in the punishment phase when the prosecutor urged the jury to impose a lengthy
sentence so that appellant=s two children
could be given Astability@ and not Atraumatic dealings
with their murdering mother.@  We address each issue below.

A.      The Demonstration: Issues
One and Two and the State=s Claim that We
Cannot Consider the DVD  

In her first two issues, appellant
contends the State=s in-court demonstration violates Texas
Rules of Evidence 602 and 403.  As an
initial matter, however, the State argues that appellant cannot prevail on
these issues because the appellate record is inadequately developed.  Specifically, the State contends that, to
determine whether the demonstration accurately portrayed the murder or how
prejudicial it was, it is necessary to actually view the demonstration, but the
appellate record contains no recorded images of it.  

1.       The Court TV DVD of the
Demonstration

The State acknowledges that appellant
attached a DVD of Court TV=s television coverage
of the demonstration as an exhibit to her motion for a hearing and new trial,
and we note that, in their appellate briefs, both parties refer to and (in
varying degrees) rely upon this exhibit. 
However, the State maintains the exhibit was never introduced as
evidence and was never subjected to adversarial examination to ensure its
authenticity, and so cannot be considered on appeal.  








Three problems in this record complicate
our ability to consider the DVD.  First,
the State cites the general proposition, contained in Martins v. State,
that affidavits attached to a motion for new trial are merely pleadings and are
not in themselves evidence.  See 52
S.W.3d 459, 468 (Tex. App.CCorpus Christi
2001, no pet.).[5]  Appellant contends Martins is
distinguishable because the trial court denied her motion without a hearing,
thus depriving her of any opportunity to offer the DVD into evidence.[6]  However, appellant does not direct us to any
authority to support her contention that the DVD is evidence we may consider
and we are aware of none. 

Second, appellant did not declare to the
trial court that she wanted the DVD to be part of the evidence.  She never requested that the trial court
admit it into evidence.  She also never
authenticated the DVD.

Third, the rules of evidence and of
appellate procedure give us no guidance on whether and to what degree we may
consider the DVD of the demonstration in these circumstances.  It is a highly unusual exhibit for us to
consider.  Although it is a recording of
the trial, unlike the official record, it was not prepared by a neutral court
employee under the court=s control. 
Instead, it is the product of a third party completely independent of
the court.  Without some guidance from
the procedural rules of this state, and with the State=s objection to its
use, we are unwilling to rely on it when we have an acceptable alternative, and
when we might jeopardize the validity of our appellate review by considering
it.








The demonstration is captured in detail in
over twenty pages of explicit trial testimony. 
In reading this testimony it is clear that Ms. Siegler, using a male
prosecutor to represent Jeff Wright, positioned the prosecutor on the Wrights= bed, had a
witness tie his arms to the bed posts with neckties and tie one leg to the bed
with a bathrobe sash.  Ms. Siegler then
proceeded to sit astride him, holding the knife and demonstrating the types and
angles of stabbing motions as instructed by Detective Reynolds.  From these descriptions we can appreciate the
dramatic nature of the demonstration.  For years, appellate courts have
decided the admissibility of in-court demonstrations without the benefit of
videos.  This particular
demonstration is not so unique that we cannot adequately assess it without the
video.  We can tell where the two
prosecutors were positionedCthe male face-up on the bed, Ms. Seigler atop him.  We know the Wrights= bed was used and that the blood
stains were still visible.  These, and
the other details we can glean from the record, are sufficient to paint an
image of what happened in the courtroom.[7]  Having resolved this introductory issue, we
now turn to the substance of appellant=s complaints
concerning the demonstration.

2.       The In-Court Demonstration
Did Not Violate Rule 602.

Throughout her first and second issues,
appellant contends that the State=s in-court
demonstration of its theory of the case confused Ahigh drama@ with reality and
thereby deprived appellant of her right to a fair trial.  In appellant=s first issue, she
contends that the court should not have allowed the demonstration because 

$                  
the
State=s witness testifying in support of
the demonstration had no personal knowledge of the events about which he
testified, and

$                  
the State failed to show that the demonstration was
substantially similar to the events it sought to portray.  








Appellant apparently claims that both of these problems
violated Rule 602 of the Texas Rules of Evidence.  We disagree. 
As we explain below, Rule 602 does not bar the demonstration.  Detective Reynolds had personal knowledge of
a great many of the details about which he testified, and the remaining details
he could reasonably deduce from those details he personally knew.  In addition, Rule 602 is not the primary
guidepost courts use to determine if a demonstration was appropriately
admitted.  Rather, case law sets out the
requirements for the admission of demonstrations.  That case law requires that the demonstration
be substantially similar to the event it depicts.  We turn first to Rule 602 and explain our
holding there. 

a.       The witness had
personal knowledge of many things about which he testified.

Rule 602 provides that a witness may not
testify to a matter unless evidence is introduced showing that the witness has
personal knowledge of the matter.  Tex. R. Evid. 602.[8]  Appellant contends that Detective Reynolds
lacked personal knowledge of the circumstances surrounding Jeff Wright=s death and so his
testimony could not support the State=s in-court
demonstration of its theory of the case. 








However, we know Detective Reynolds had
personal knowledge of a number of key facts because he was present at the crime
scene, viewing both the body and the scene itself.  For example, Detective Reynolds knew Jeff
Wright was tied to some object because he saw the ligatures on Jeff=s body (and
appellant admitted tying Jeff to the bed at one point).  He knew Jeff Wright was stabbed and that the
wounds were inflicted on the couple=s bed because he
saw the bloody mattress and remnants of blood stains on the bedroom walls by
the bed.  He was able to study the wounds
themselves, noting the direction of the stabs and the location of the
wounds.  He knew the relative sizes of
Susan and Jeff Wright, surmising that Susan could not overcome her husband
without some plan.  Finally, he observed
appellant=s erratic behavior after the crime.  All of these facts Detective Reynolds knew
from personal knowledge and experience, and his testimony about them did not
violate Rule 602.

b.       The witness could make
reasonable inferences from the facts he knew.








Those parts of the demonstration for which
Detective Reynolds lacked personal knowledge were admissible as lay opinion
because they were reasonable inferences from those facts he did know by
personal knowledge.  Tex. R. Evid. 701.  Under Rule 701, a witness, even a lay
witness, may make reasonable inferences from the evidence.[9]  Detective Reynolds, as a lay witness, was
entitled reasonably to infer how the crime occurred based on those facts he knew.[10]
See Osbourn v. State, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002)
(stating that a witness=s testimony can include opinions, beliefs,
or inferences as long as they are drawn from his or her own experiences or
observations); Ventroy v. State, 917 S.W.2d 419, 422 (Tex. App.CSan Antonio 1996,
pet. ref=d) (holding
officer=s testimony about
point of impact, automobile=s direction of
travel, and other opinions about crime scene was admissible as both lay opinion
and expert testimony in trial for attempted murder of victim struck by
automobile when based on personal knowledge and experience); Reece v. State,
878 S.W.2d 320, 325 (Tex. App.CHouston [1st
Dist.] 1994, no pet.) (holding officer could testify, based on his training and
experience, that a defendant=s actions were
consistent with selling cocaine); Williams v. State, 760 S.W.2d 292, 296
(Tex. App.CTexarkana 1988, pet. ref=d) (holding
officer=s testimony about
the common use of vise grips to assist in stealing cars was admissible opinion
testimony by a lay witness); see generally 2 Steven Goode, et al., Guide to the Texas Rules of Evidence ' 701.2 (3d ed.
2002).  Police often have to reconstruct
crimes they did not witness.  They do
this by inferring the cause of an event they did not witness from facts and
evidence they do know.[11]  In fact, appellant does not dispute that
Detective Reynolds could have explained his theory of the case via
testimony.  If Rule 602 does not bar his
testimony describing the event, it should not bar the demonstration.  

In short, Rule 602 does not bar the
demonstration and, in fact, it is not the controlling factor in the
demonstration=s admissibility.  Instead, case law contains the most commonly
cited requirements for admission of demonstrations.

3.       Case Law Generally Focuses
on whether the Demonstration was Substantially Similar to the Event.

a.       What the proponent of
the demonstration must show.

Case law generally focuses on whether the
demonstration was substantially similar to the event.  See, e.g., Valdez v. State, 776
S.W.2d 162, 168 (Tex. Crim. App. 1989) (en banc); Cantu v. State, 738
S.W.2d 249, 255 (Tex. Crim.  App. 1987)
(en banc); Key v. State, 149 Tex. Crim. 200, 192 S.W.2d 563, 566
(1946).  The proponent of the
demonstration must show that the conditions under which the demonstration is
conducted are sufficiently similar to the event in question.  Valdez, 776 S.W.2d at 168; Cantu,
738 S.W.2d at 255.  It is not essential
that the conditions of the demonstration be identical; dissimilarities go to
weight and not to admissibility.  See
Valdez, 776 S.W.2d at 168.  All parts
of the demonstration must be supported by the evidence or testimony.  See Cantu, 738 S.W.2d at 255; Forth
Worth & Denver Ry. Co. v. Williams, 375 S.W.2d 279, 281B82 (Tex. 1964); Ginther
v. State, 706 S.W.2d 115, 119B20 (Tex. App.CHouston [1st
Dist.] 1986, pet. ref=d). 
We review the trial court=s ruling for abuse
of discretion.  See Valdez, 776
S.W.2d at 168; Cantu, 738 S.W.2d at 255. 
Out of necessity, reviews of trial court rulings on demonstrations
depend on the facts of the case.

 








b.       This demonstration was
supported by, and consistent with, the testimony.

(i)      Undisputed facts.

Many of the details of the scene were not
disputed, and the State=s demonstration accurately portrayed
them.  The State used the actual mattress
that was the site of the stabbing.  The
participants portraying appellant and Jeff Wright, Ms. Siegler and Mr. Doyle,
were shown to be of similar height and weight to appellant and her
husband.  Detective Reynolds testified
that, based on his observations of Jeff Wright=s body, the
ligatures used to tie Mr. Doyle to the bed were substantially similar to the
ones actually used, and appellant did not dispute this.  The parties also did not dispute the general
location and grouping of the stab wounds on Jeff Wright=s body.  Detective Reynolds testified to these facts
based on his personal observations.  As a
result, appellant cannot validly complain that these details vary too greatly
from the actual event.

(ii)      Disputed facts.

Although some details were disputed, such
as when appellant tied Jeff Wright with the ligatures and where on the bed they
were tied, the main differences between appellant=s version of her
husband=s death and the
State=s version are
global in nature.  Thus, the parties
disagree as to how Jeff Wright came to have 193 stab wounds.  The appellant says it was the result of a
rape, the ensuing struggle, and a psychotic condition induced by the horror of
the event; the State claims it was, plain and simple, a murder.  With the only eyewitness being the defendant,
the State had to reconstruct the progression of the event.  As discussed in the previous section, the
State did this by deductions from the clues given by the physical evidence and
the statements and actions of the defendant. 








For example, the deductions from the clues
given by the physical evidence led to the prosecutor=s positioning on
the bed (supported by Detective Reynolds= testimony that
Jeff Wright=s body was discovered with tightly tied
ligatures on his wrists and ankle, and that the large number of wounds on the
front of his body indicated he had been restrained face-up).[12]  The deductions also supported that part of
the demonstration in which the male prosecutor=s arms and one leg
were tied to the bed posts. 

In short, all parts of the demonstration,
both disputed and undisputed, were supported by facts in evidence.  Detective Reynolds= testimony was
based on his personal observations as well as his deductions.  Given the State=s evidence and the
reasonable inferences that may be drawn from it, we find the demonstration was
substantially similar to the actual event as theorized by the State.  See Valdez, 776 S.W.2d at 168B69 (upholding
in-court demonstration of six disarming techniques by which a person might take
police officer=s weapon when sufficient evidence
supported inference that defendant was able to disarm officer and use his
weapon to shoot him); Stembridge v. State, 94 Tex. Crim. 207, 250 S.W.
180, 181 (1923) (upholding demonstration in which State re-created how husband=s body was found
in bed and wife was asked to demonstrate how she claimed to have shot husband
in self-defense); see also United States v. Wanoskia, 800 F.2d 235, 238
(10th Cir. 1986) (upholding in-court demonstration using estimate of length of
deceased wife=s arms to show she could not have shot
herself as husband claimed).

c.       Appellant=s cited cases do
not require a reversal.








Appellant cites a number of cases in which
filmed or in-court demonstrations were held to be not substantially similar to
the actual event and argues that they reveal the flaws in this
demonstration.  We find these cases
distinguishable.  The demonstrations in
those cases were either plainly inaccurate or unsupported by any evidence.[13]  Here, in contrast, all parts of the
demonstration were supported by the State=s witness, who
testified to the physical evidence and made reasonable deductions from it.  Appellant=s claims of
inaccuracy really only question those parts of the demonstration that were
deductions from the evidence.  The
conflict, then, is largely over when and how Jeff Wright was
restrained and stabbed, rather than if he was restrained and
stabbed.  








For example, appellant does not deny that,
at some point, she stabbed him while he was on the bed.  Under her version of events, after Jeff
Wright raped her on their bed, he got back on top of her with the knife, and
she wrestled it from him and began stabbing him in the neck and chest.  When asked where she was while she was
stabbing him, appellant testified: AOriginally I was
to the side.  But then eventually I
climbed over like he was on me because I couldn=t stop stabbing
him.@  Appellant then described where she repeatedly
stabbed her husband:  

In his head, in
his chest, and in his neck and in his stomach. 
And his leg from when he kicked me. 
I stabbed him in his penis for all the times that he made me have sex
and I didn=t want to. 
And I couldn=t stop because he was going to kill me and
I couldn=t stop.   

Appellant also admitted that she tied ligatures to her
husband=s limbs, but when
she did it and why she did it conflict with the State=s version of
events.  Appellant claimed that, after
she had stabbed her husband several times, her son knocked on the bedroom
door.  Believing her husband was alive
and that he would come after her again, appellant tied his right arm to the bed
to restrain him while she checked on her son. 
She then testified that she returned to the bedroom and continued
stabbing her husband, and when she finally stopped, she put her husband=s body on a dolly
and tied his ankles and left arm to the dolly to get the body out of the
house.  

Thus, there is no dispute that Jeff Wright
was stabbed on the bed and that he was somehow restrained with ligatures; at
the crux of the case is when he was restrained and how he came to be
stabbed.  Supported by sufficient
evidence, the State was entitled to demonstrate its theory for the jury, not
only to show that a murder could have occurred as the State theorized, but also
to show that the incident could not have happened as appellant contended.  See Valdez, 776 S.W.2d at 168B69; Stembridge,
250 S.W. at 181; Wanoskia, 800 F.2d at 238B29.  

d.       The demonstration is
not invalid because it was based on reasonable inferences from the evidence.








Appellant also maintains that the
demonstration is not substantially similar to the actual event because  Detective Reynolds had to Aspeculate@ where on the bed
the ligatures may have been tied.  We
already have held that this testimony is a reasonable deduction from facts in
evidence; it was not Aspeculation.@  Detective Reynolds saw the ligatures tied to
Jeff Wright=s wrists and leg, at the death scene, at
the morgue, and in photographs.  Although
Detective Reynolds admittedly did not know where on the headboard of the bed
the ligatures were tied, it was reasonable for him to infer that appellant
secured the ligatures to the bed in some fashion.  See Valdez, 776 S.W.2d at 169.  Moreover, the precise location where the
ligatures were tied is an insignificant fact; the more important question is when
appellant tied Jeff Wright=s arms and
legs.  As we have noted, it is not
necessary that the demonstration be identical to the event in every
respect.  See id. at 168; Cantu,
738 S.W.2d at 266; see also Key, 192 S.W.2d at 566 (holding minor
differences in details of demonstration and actual event did not render
reenactment substantially dissimilar).[14]  Appellant has not cited any cases, and we
have found none, in which a court has held that the State cannot present its
version of events based on reasonable inferences from the physical and other
evidence.  We see no reason why a
demonstration based on reasonable deductions should not be allowed if it meets
the criteria of the in-court demonstration case law and is not prejudicial
under Rule of Evidence 403.

In conclusion, based on the State=s evidence and the
reasonable inferences drawn from it, we find that the State=s demonstration of
its theory of the case was substantially similar to the conditions of the
actual event.  We therefore overrule
appellant=s first issue.

4.       The
In-Court Demonstration Did Not Violate Rule 403.








We now turn to appellant=s second issue,
her claim that the demonstration deprived her of the right to a fair trial
because it violated Rule 403 of the Texas Rules of Evidence.  Rule 403 provides that relevant evidence may
be excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury.  Tex.
R. Evid. 403.  Evidence is
unfairly prejudicial if it has Aan undue tendency
to suggest that a decision be made on an improper basis.@  Montgomery v. State, 810 S.W.2d 372,
389 (Tex. Crim. App. 1991) (en banc) (op. on reh=g). A Rule 403
analysis by the trial court should include, but is not limited to, the
following factors: (1) the probative value of the evidence; (2) the potential
of the evidence to impress the jury in some irrational but nevertheless
indelible way; (3) the time the proponent needs to develop the evidence; and
(4) the proponent=s need for the evidence.  Erazo v. State, 144 S.W.3d 487, 489
(Tex. Crim. App. 2004) (citing Montgomery, 810 S.W.2d at 389B90).  We review the trial court=s Rule 403
decision for an abuse of discretion, meaning it will be reversed only if it is
outside the zone of reasonable disagreement. 
Salazar v. State, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001).  Rule 403 favors the admission of relevant
evidence and carries a presumption that relevant evidence will be more probative
than prejudicial.  Threadgill v. State,
146 S.W.3d 654, 671 (Tex. Crim. App. 2004) (en banc).  We will consider each of the factors.

a.       The probative value of
the in-court demonstration.     

Appellant contends that the first factor,
the probative value of the in-court demonstration, weighs in her favor because
the demonstration was not substantially similar to the events it sought to
portray; a verbal description would have been sufficient.  We already have determined that the
demonstration was substantially similar to the State=s version of the
progression of events the night appellant killed her husband.  As noted in the preceding discussion of Rule
602, the State=s theory of how appellant killed her
husband is supported by both the evidence and testimony explaining the reasons
the State reached this conclusion.  Being
an accurate portrayal of the State=s version of
events, it had probative value; it enabled the jury to visually evaluate the
plausibility of both the State=s theory and
appellant=s self-defense claim.  For example, it allowed the jury to see
first-hand the relative height and weight of appellant and her husband, their
ability to maneuver on or around the bed, and their ability to take defensive
actions.  The demonstration therefore
conveyed the evidence more effectively than if a witness had merely described
it.  Thus, this factor weighs in favor of
the admissibility of the demonstration.








Although appellant argues forcefully that
this presentation was marred in the same way as the presentation in United
States v. Gaskell, we disagree.  In Gaskell,
the Eleventh Circuit held that the probative value of an in-court reenactment
by a prosecution witness demonstrating shaken baby syndrome using an infant
mannequin was substantially outweighed by its potential for unfair
prejudice.  See 985 F.2d at 1061B62.  But the reasons for this conclusion were many
and were warranted.  The court held the
presentation was of slight probative value and overwhelmed by its unfairly
prejudicial effects because (1) the weight of the mannequin=s head was
different than a live baby=s head, (2) the
flexibility and length of its neck was different, (3) the mannequin had to be
shaken with Aa considerably greater degree of force@ to produce the
head movement characteristic of shaken baby syndrome, (4) the witness=s presentation was
not shown to be based on reliable information, and (5) there was no evidence of
the number of oscillations needed to produce the infant=s injuries.  Id. 
Thus, the court concluded that Athe demonstration
tended to implant a vision of Gaskell=s actions in the
jurors= minds that was
not supported by any factual basis for the demonstration.@  Id. at 1061.  Here, we have no similar deviation from the
evidence.  The demonstration was
adequately supported by the evidence and accurately depicted the State=s claim that
appellant killed her husband, not in self-defense, but intentionally.  Consequently, we find Gaskell
distinguishable.

b.       The in-court
demonstration=s ability to impress jurors irrationally
yet indelibly.

The second factor is the demonstration=s ability to
impress jurors in some irrational yet indelible way.  Appellant contends this factor also weighs
heavily in her favor.  She compares the
demonstration to a sensationalized murder scene in a provocative movie, urging
that it bore only Aa fleeting connection to reality.@  Its impact had the potential to mislead the
jurors, she claims, and to cause them to decide the case on the basis of
emotion rather than relevant evidence. 
The State responds that, although the demonstration may have impressed
the jury, it did not do so in an irrational way.  As we explain below, we agree with the State.













We recognize that courts have spoken to
the dangers of filmed or in-court demonstrations that may have the potential to
encourage jurors to resolve the material issues on an improper basis.[15]  See, e.g., Lopez v. Foremost Paving, Inc.,
796 S.W.2d 473, 479 (Tex. App.CSan Antonio 1990,
writ dism=d) (noting the Apowerful effect of
videotape on jurors@ and potential for confusion when films do
not duplicate accident conditions with accuracy); State v. Trahan, 576
So.2d 1, 8 (La. 1991) (AThe strong impact of seeing an inaccurate
reenactment creates such a substantial possibility of prejudice that it is
unlikely cross-examination could effectively point out the discrepancies.@); State v.
Philbrick, 436 A.2d 844, 859 (Me. 1981) (noting that A[t]he persuasive
power on juries of in-court demonstrative evidence is widely conceded,@ and therefore the
trial court should exercise its discretion carefully).  We also are mindful that, given its violent
subject matter, this particular demonstration almost certainly did impress the
jury.  

(i)      Six aspects ensured
that the demonstration and trial did not impress jurors irrationally and
indelibly.

But the question before us is not whether
the demonstration Aimpressed@ the jury.  The question is whether it impressed the jury
in an irrational yet indelible way. 
Several factors keep this demonstration from being one that would
impress the jury in an irrational way.  

First, this was not a reenactment or
dramatic presentation per se. 
Nothing in the appellate record suggests that the two prosecutors
attempted to re-create the struggle or the facial expressions of appellant and
her husband that must have occurred when appellant stabbed her husband.  See Lopez, 651 S.W.2d at 414B15 (AThe general
appearance of an actor, his facial expression or slightest gesture whether
intended or not may sway a juror who has listened to lengthy testimony.@).  Nothing in the appellate record suggests that
the prosecutors used gestures or their voices to portray the intensity of the
scene.  And although we do not rely on
the DVD and cannot verify with 100% certainty that no facial expressions were
used, the transcript does not create the impression that harmful expressions
were used, and appellant does not point to facial expressions as being the
problem.  The purpose of this
demonstration was to highlight the specific details that supported the State=s theory that
appellant murdered her husband.

Second, the demonstration was not intended
to re-create the event in minute detail, showing where every blow landed and
where appellant was when she inflicted each wound.  This demonstration was intended to convey
appellant=s plan to kill Jeff Wright and generally
how appellant accomplished her goal. 
When Detective Reynolds was asked to tie the ligatures to the headboard,
he made it clear he did not know exactly where on the headboard they were
tied.  At the same time, he made it clear
that, in his opinion, appellant had to have restrained Jeff Wright in some way
and that the headboardCalong with the ligaturesCwas the most
logical place and prop to be used for that.








Third, the demonstration appears to have
been presented in a matter-of-fact, methodical manner.  The purpose of the demonstration was
two-fold: to depict how appellant killed her husband and to illustrate why the
State reached this conclusion.  The
testimony focused on the details leading to this conclusion: the location of
the wounds, the appellant=s positioning to have made those wounds,
the direction of the knife blade as it made the wounds, Jeff Wright=s ability to move
his arms and legs to defend himself if tied with the ligatures, and the height
and weight of appellant and her husband. 


Fourth, any juror confusion related to the
ligatures was likely alleviated when the trial court instructed the jury that
the State was not attempting to show the exact location where Jeff Wright=s wrists were tied
to the bed.  See Foremost Paving, 796
S.W.2d at 480B81 (noting that Athe offering party=s affirmative
acknowledgement [sic] to the jury of dissimilarities between a videotaped
reconstruction and the actual occurrence can serve to alleviate unfairness@).

Fifth, when appellant=s counsel
cross-examined Detective Reynolds, it was quite clear that Detective Reynolds
(1) was not there when appellant killed Jeff Wright, (2) deduced how Jeff
Wright was killed, and (3) did not know where on the bed the ligatures were
tied because Jeff Wright=s body was not on the bed when the police
found it.  Thus, the jury understood that
the demonstration presented the State=s theory of how
Jeff Wright was killed.  Moreover,
appellant could have used the bed for her own demonstration of the night=s events.  But, she chose not to demonstrate what she
claimed happened the night of Jeff Wright=s death.  








Sixth, in many ways, the demonstration was
less graphic than the actual event.  For
example, although there were at least 193 stab wounds on Jeff Wright=s body, Ms.
Siegler did not attempt to re-create them all, but merely demonstrated the
stabs generally, consistent with Detective Reynolds= testimony.  The State also did not attempt to re-create
the gruesome, bloody scene depicted in the photographs admitted into
evidence.  Nor was there any attempt to
depict that portion of the State=s theory that
appellant was able to tie her husband to the bed by seducing him with candles
and promises of sex.  Nor was it
misleading or confusing; rather, it depicted events relevant to appellant=s guilt or
innocence.  Cf. Reese v. State, 33
S.W.3d 238, 242 (Tex. Crim. App. 2000) (stating that photograph tended to
impress jury in irrational way when it showed much more than facts relevant to
trial).  

In short, although the demonstration
surely was dramatic, these factors outlined above tethered each part of the
demonstration to reality and to details that supported the demonstration.  For these reasons, we find that the
demonstration did not impress the jury irrationally and indelibly.

(ii)      Other aspects relied
on by appellant do not alter our conclusion.

Other aspects of the demonstration pointed
out by appellant do not alter our conclusion. 
We are aware that the lead female prosecutor straddled a male prosecutor
lying face-up on the bed to show how appellant accomplished the crime, and we
are aware that the State claimed appellant was able to tie her husband by
seducing him.  However, this in itself
does not invalidate the demonstration and give it an irrational aura.  The questions were relevant and
informational.  There were no innuendos,
no side-bar comments, no excessive illustrations of the stabs.  When the prosecutor held the knife, it was to
show how appellant most likely held it. 
When the lead prosecutor straddled the male prosecutor, it was to
illustrate why the majority of Jeff Wright=s wounds were on
the front and left side of his head, neck, and chest area.  The discussion was of a violent killing, not
of a seduction scene. 








We agree with appellant that the
demonstration went to the heart of her case and that it hurt her defense.  But all State=s evidence, if
effective, hurts a defendant=s defense.  The demonstration was supported by the
evidence, and it is not rendered inadmissible solely because it may have been
prejudicial to appellant=s case; it must be Aunfairly@ prejudicial.  See Manning v. State, 114 S.W.3d 922,
927B28 (Tex. Crim.
App. 2003) (noting that while evidence may be prejudicial, it may not be
unfairly prejudicial).  As the Court of
Criminal Appeals explained in Cohn v. State: A>Unfair prejudice= does not, of
course, mean that the evidence injures the opponent=s caseCthe central point
of offering evidence.  Rather it refers
to >an undue tendency
to suggest decision on an improper basis, commonly, though not necessarily, an
emotional one.=@  849 S.W.2d 817, 820 (Tex. Crim. App.1993) (en
banc) (citing 1 Steven Goode, et al.,
Guide to the Texas Rules of Evidence:
Civil and Criminal ' 403.2, at 93 (2d
ed.1993)).  And, any unfair prejudice
must substantially outweigh the probative value of the
demonstration.  See Robbins v. State,
88 S.W.3d 256, 263 (Tex. Crim. App. 2002) (noting that Rule 403 requires that
danger of unfair prejudice must substantially outweigh probative value).  This demonstration did not have the undue
tendency to suggest decision on an improper basis.

In conclusion, this factor weighs in favor
of admissibility.

c.       The time needed to
develop the in-court demonstration.

Appellant concedes this factor weighs in
favor of admissibility, as the demonstration took less than twenty minutes.  

d.       The State=s need for the
in-court reenactment.

In resolving the fourth factor, the State=s need for the
staged in-court demonstration, we consider three subparts: (1) does the
proponent have other available evidence to establish the fact of consequence
that the evidence is admissible to show? (2) if so, how strong is that other
evidence? (3) and is the fact of consequence related to an issue in
dispute?  See Montgomery, 810
S.W.2d at 390; Reese, 33 S.W.3d at 242. 
Appellant argues that this factor weighs in her favor because the State
had numerous photographs and expert testimony to buttress its theory.  She also contends the State did not need the
demonstration to rebut her self-defense theory because she had not yet
testified when the State presented it, and the State had available to it the
less prejudicial alternative of cross-examining her.  








The State largely concedes the first
subpart, noting in its brief that it A[o]bviously@ had other
evidence with which to communicate its theory of the stabbing to the jury,
including the testimony of Detective Reynolds and the medical examiner.  However, the State emphasizes the
effectiveness of the dramatic demonstration, and contends it had a compelling
need for the demonstration to enable the jury to visually evaluate both the
State=s theory and
appellant=s defense on a relevant issueCwhether Jeff
Wright was restrained when appellant began to stab him or, as appellant
testified, he was not.  We agree that the
demonstration was a much more forceful and clear illustration of the State=s theory than mere
testimony.

The jurors were able to see for themselves
the difference in size between appellant and her husband.  The jury was able to see how the ligatures
workedCaccording to the
StateCand assess how
plausible the State=s theory was.  

The photographs of Jeff Wright=s body and the
explanation given by Detective Reynolds and the medical examiner adequately
explained the State=s theory, but the demonstration almost
certainly heightened the jury=s comprehension of
the theory.  Although it is a close call,
this factor favors the admissibility of the demonstration.

In summary, we find that all of the four
factors weigh in favor of admissibility under Rule 403, and hold that the trial
court did not abuse its discretion in permitting the demonstration on this
basis.  We overrule appellant=s second issue.

B.      Issue Three: The Motion for
Hearing and New Trial

In her third issue, appellant contends the
trial court erred in denying her motion for a hearing and new trial based on Athe prosecution=s speculative and
overly prejudicial bed demonstration.@  We disagree.








The right to a hearing on a motion for new
trial is not absolute.  Reyes v. State,
849 S.W.2d 812, 815 (Tex. Crim. App. 1993) (en banc).  However, a defendant is entitled to a hearing
on her motion for new trial if the motion and the supporting affidavits raise
matters not determinable from the record that could entitle her to relief.  Wallace v. State, 106 S.W.3d 103, 108
(Tex. Crim. App. 2003) (en banc).  To be
sufficient to entitle the defendant to a hearing, the motion for new trial and
accompanying affidavits do not need to establish a prima facie case for a new
trial.  Jordan v. State, 883
S.W.2d 664, 665 (Tex. Crim. App. 1994) (en banc).  These documents need only reflect that
reasonable grounds exist for holding that a new trial could be granted.  Martinez v. State, 74 S.W.3d 19, 22
(Tex. Crim. App. 2002) (en banc).  We
review the trial court=s decision not to hold a hearing on a
motion for new trial under an abuse of discretion standard.  Wallace, 106 S.W.3d at 106.








Appellant contends that a post-trial
article in the Houston Chronicle raised matters not determinable from the
record.  Specifically, she alleges that
the article demonstrates that the lead prosecutor, Ms. Siegler, acted in bad
faith and contrary to her ethical duties as an officer of the court when she
assured the trial court that the demonstration was not based on speculation and
was not unfairly prejudicial.  The March
13, 2004 Houston Chronicle article, entitled A>Pushy= Wright Prosecutor
knows Drama,@describes Ms. Siegler as knowing the bed
demonstration Awould make good courtroom drama,@ and quotes her
explaining that she did not attempt to demonstrate appellant stabbing Jeff
Wright at least 193 times because A[f]irst of all, we
don=t know where she
stabbed first.  We don=t know when she
stopped and took a break.  We don=t know how the
penis slices came in the middle of all this. 
I didn=t go that far because I wasn=t sure how that
happened.@[16]  Appellant contends this article demonstrates
that Ms. Siegler knew the demonstration was based on speculation, and therefore
appellant was entitled to a hearing to develop the issue.  We disagree.

At most, the article reflects that Ms.
Siegler did not attempt to re-create every aspect of the alleged murder because
she did not know the exact order in which the wounds were inflicted on Jeff
Wright or at what points appellant may have stopped or rested.  Nothing in the article suggests that any part
of the demonstration actually presented to the jury was inaccurate or based on
speculation.  The trial judge obviously witnessed
the demonstration and ruled on appellant=s objections to it
and the supporting testimony of Detective Reynolds based on the evidence that
was presented.  We have determined that,
based on the evidence, the demonstration was conducted under conditions substantially
similar to the actual event.  In this
case, the exact order in which the injuries were inflicted or the moments at
which appellant may have taken a break did not affect the admissibility of the
demonstration.  The newspaper article
raised nothing that could not be determined from the record, and therefore
appellant=s motion failed to demonstrate reasonable
grounds for a hearing on the issue of whether the demonstration was based on
speculation.  Accordingly, the trial
court did not err in denying her motion for a hearing.  See Reyes, 849 S.W.2d at 816
(reaffirming that a hearing is not required when the matters raised in the
motion for new trial are subject to being determined from the record).

C.      Issue Four: The State=s Allegedly
Improper Reference to Punishment During Final Argument in the Guilt-Innocence
Stage of the Trial

In her fourth issue, appellant contends
the trial court erred in overruling her objection after the State allegedly made
a reference to the issue of punishment during final argument in the
guilt-innocence stage of the trial.  We
disagree.

1.       The Standard of Review








The four general areas for proper jury
argument are (1) summation of the evidence, (2) reasonable deduction from the
evidence, (3) answers to argument of opposing counsel, and (4) pleas for law
enforcement.  Guidry v. State, 9
S.W.3d 133, 154 (Tex. Crim. App. 1999). 
The prosecutor may draw all reasonable inferences from the facts in
evidence that are reasonable, fair, and legitimate.  Allridge v. State, 762 S.W.2d 146, 156
(Tex. Crim. App. 1988) (en banc).  Error
exists when facts not supported by the record are interjected in the argument,
but such error is not reversible unless, in light of the record as a whole, the
argument is extreme or manifestly improper.  Id. at 155.

2.       Analysis of the Prosecutor=s Argument

During the prosecutor=s rebuttal
argument, the following exchange ensued:

The State:    (Ms. Siegler) Can we just for a minute take a deep breath and
look at this case with the fresh eye of common sense?  

Don=t think like a lawyer.  Don=t think like a cop. 
Don=t think like a prosecutor.  Don=t think like a defense lawyer.  Just use your common sense and think like a
normal person.

Do you really think anything else
happened in that bedroom when a body is discovered in a hole with ligatures
around both wrists and around the ankle except for the fact that he was tied
up, as hard as he could be tied up, and stabbed all over the front, not the
back, same as a right-handed person would do, to a bed, perfect bedposts, 193
times.

And the only way that that could
happen when a defendant is the size she is, and her husband was the size he
was, was if she tied him up.

And to talk about self-defense
under this scenario is a joke.  Really,
it=s a joke.

And I want you to think about the
reality of what the defense strategy is. 
Think about it really hard.

They tell you that their defense is
self-defense.  

No one really expects y=all to believe it=s self-defense.  But see, self-defense means you get to say
battered wife.  And you get to say, Jeff=s a jerk, and Jeff=s an abuser, and Jeff=s all these horrible things.  

See, that let=s all that into evidence. 
You get it.  

And why is that all important?








Because tomorrow, when we talk
again, you won=t care about Jeff being
killed.  See.  This pretty little beautiful blonde lady won=t be punished as severely because
Jeff is such a jerk.  Who cares about
what happened to Jeff.

Defense:      (Mr. Davis) Your Honor, this is totally improper.  This is punishment argument.

The State:    I=m talking about their strategy,
Judge.

The Court:    It=s overruled.

The State:    That=s what=s going on here.

Appellant contends the highlighted argument was improper
because it told the jury to ignore its duty to decide appellant=s guilt or
innocence and get to the only real issue in the caseCpunishment.  To support her argument, appellant cites Cherry
v. State, 507 S.W.2d 549 (Tex. Crim. App. 1974), and Kelly v. State,
903 S.W.2d 809 (Tex. App.CDallas 1995, pet. ref=d).  In Mann v. State, the Court of
Criminal Appeals explained that the prosecutors= comments in both Cherry
and Kelly were improper because they essentially told the jury to ignore
their duties to decide guilt or innocence because the only issue in the case
was what punishment should be assessed to the defendant.  Mann v. State, 718 S.W.2d 741, 744
(Tex. Crim. App. 1986). 








It is generally improper for the State to
comment on punishment during the guilt-innocence stage of the trial.  See McClure v. State, 544 S.W.2d 390,
393 (Tex. Crim. App. 1976); Cherry, 507 S.W.2d at 549.  However, not every reference to punishment at
the guilt-innocence stage is improper.  Cf.
Mann, 718 S.W.2d at 744; see also Barnes v. State, No. 01-01-01086,
2002 WL 31388820, at *2 (Tex. App.CHouston [1st
Dist.] Oct. 24, 2002, no pet.) (not designated for publication) (holding
prosecutor=s isolated argument referencing punishment
was not improper because it was responsive to evidence in the record and was
not intended to inflame the jury).  We
find that the prosecutor=s argument here did not encourage the jury
to ignore their duties to decide guilt or innocence, nor did it suggest that
punishment was the only real issue. The prosecutor was urging the jurors to be
suspicious of appellant=s claim of self-defense as a possible
trial strategy ploy to get before the jury evidence of Jeff Wright=s alleged bad
character that otherwise would be inadmissible. 
Thus, the argument was in answer to opposing counsel=s argument that
appellant acted in self-defense and was a response to the presentation of
appellant=s case. 


The prosecutor was not telling the jury to
disregard the guilt-innocence stage because it was not important.  To the contrary, she did not mention
punishment again; she spent the remainder of her argument discussing the
guilt-innocence evidence and focusing the jury on its duty to evaluate this
evidence and render a verdict.  We
therefore find Cherry and Kelly distinguishable, and hold that
the trial court did not err in overruling appellant=s objection to the
prosecutor=s argument.  We overrule appellant=s fourth issue.

D.      Issues Five, Six, and
Seven: The State=s Allegedly Improper Arguments During the
Punishment Stage

In her remaining three issues, appellant
contends that, during the prosecutor=s rebuttal
argument in the punishment stage, the trial court erred in overruling appellant=s objections to
the prosecutor=s allegedly improper arguments in three
instances.  Appellant contends the
prosecutor=s arguments were outside the record, were
not reasonable deductions from the evidence, and injected new facts harmful to
her case into the trial.  We address each
separately.

1.       ATake your fist back
there and pound that wall as hard as you can.@

In her fifth issue, appellant complains
about the following exchange:

The State:    (Ms. Siegler) Their domestic violence theory.  That=s absurd.

Guys, you know good and well if you took your foot
and you kicked as hard as you could into another man=s ribs, much less a woman, that man
would be crippled up and going to a hospital. 
Y=all know that.

Take your fist back there and pound that wall as
hard as you can and tell each other that she wouldn=t have had a broken bone.








Defense:      (Mr. Davis) Object, your Honor.

The State:    -- and a break --

Defense:      Objection, your Honor. 
Fist back in the jury room.

The Court:    Overruled.

The State:    Think about it then.

As an initial matter, the State contends
that appellant failed to preserve error by failing to raise a sufficiently
specific objection.  See Tex. R. App. P. 33.1(a)(1) (to preserve
error, objection must be timely and specific unless specific grounds are
apparent from the context). We agree. 
There are two main purposes for requiring a timely, specific objection:
(1) to inform the trial court of the basis of the objection and give the trial
court the opportunity to make a ruling on it; and (2) to give opposing counsel
the opportunity to take appropriate action to remove the objection or provide
other testimony.  Garza v. State,
126 S.W.3d 79, 82 (Tex. Crim. App. 2004). 
Here, appellant=s counsel simply objected to the argument
and quoted the allegedly objectionable phrase. 
On appeal, appellant contends the statement was improper because it was
outside the record and it encouraged the jurors to conduct an experiment.  However, appellant did not inform the trial
judge of either objection she now raises. 
Nor can we say that the nature of the objection now before us is
apparent from the context and the circumstances presented.  See Heidelberg v. State, 144 S.W.3d
535, 542B43 (Tex. Crim.
App. 2004) (en banc) (holding appellant failed to preserve error when trial
judge overruled objection without comment and record gave no indication of
basis for objection asserted on appeal). 
We overrule appellant=s fifth issue.

2.       A[L]et God take them
if it would bring Jeffrey back.@

In her sixth issue, appellant complains of
the following argument:

The State:    (Ms. Siegler) Those of you who have kids, you know what you
think.  Y=all -- y=all are lucky when you get to leave
here later today or tomorrow and you get in your car and you drive away. . . .








. . . And you know that Kay and Ron would stand
up right now and let God take them if it would bring Jeffrey back.  You know that.

Defense:      (Mr. Davis) I=m -- 

The State:    They have to live -- 

Defense:      Object to that, Your Honor, that=s not -- that=s -- there is no evidence of that.  Telling things she knows.

The Court:    It=s overruled. 

Appellant contends the above-highlighted
argument was improper because neither of Jeff Wright=s parents made the
statement attributed to them by the prosecutor, and no reasonable deduction can
be made from this non-evidence.  However,
we find the prosecutor=s argument was an appeal to common
knowledge.  See Nenno v. State,
970 S.W.2d 549, 559 (Tex. Crim. App. 1998); Carter v. State, 614 S.W.2d
821, 823 (Tex. Crim. App. [Panel Op.] 1981). 
In addition, Jeff Wright=s parents
testified to the extreme grief and pain they experienced from losing their
son.  Thus, the prosecutor=s argument simply
acknowledged the devastating effect Jeff Wright=s death had on his
parents.  We overrule appellant=s sixth issue.

3.       ATo give them
stability, not traumatic dealings with their murdering mother.@

In her seventh issue, appellant complains
about the prosecutor=s argument that appellant should be given
a lengthy sentence to keep her away from her children:

The State:    (Ms. Siegler)  Give this
family the opportunity to raise them normally, to provide for their college
education like they=ve already started.  To give them stability, not traumatic
dealings with their murdering mother.  

Give them the
opportunity to raise Bradley and Kaily away from her until they are grown
adults.

To this argument, appellant objected that the argument was
not proper because it Agoes against the testimony of the ad
litem.@








We hold that appellant=s objection failed
to preserve her complaint because the objection made at trial does not
correspond to the arguments she raises on appeal.  An objection stating one legal basis may not
be used to support a different legal theory on appeal.  Cook v. State, 858 S.W.2d 467, 474
(Tex. Crim. App. 1993) (en banc); Rezac v. State, 782 S.W.2d 869, 870
(Tex. Crim. App. 1990) (en banc).  At
trial, appellant objected that the argument was inconsistent with a witness=s testimony; on
appeal, she contends that the argument was outside the record, was not a
reasonable deduction from the evidence, and injected new facts harmful to her
into the trial.  An objection that the
argument conflicts with the evidence is different than an objection that the
argument is outside the record.  An
argument may conflict with one witness=s testimony but
still be supported by other evidence or inferences from other evidence.  Therefore, nothing is presented for
review.  See Rezac, 798 S.W.2d at
871. 

II.       Conclusion

In summary, we hold that the State=s in-court
demonstration of its theory of the case was conducted under substantially
similar conditions to the actual eventCas deduced by the
StateCand was not
unfairly prejudicial in violation of Rules of Evidence 602 and 403.  We further hold that the trial court did not
err in denying appellant=s motion for a hearing and new trial,
because appellant failed to raise reasonable grounds for a hearing.  Finally, we hold that the trial court did not
err in overruling appellant=s objections to
the prosecutor=s arguments during the guilt-innocence and
punishment stages of the trial.  We
affirm the trial court=s judgment.

 

/s/      Wanda
McKee Fowler

Justice

 

Judgment rendered
and Opinion filed November 17, 2005.

Panel consists of
Chief Justice Hedges and Justices Fowler and Frost.

Publish C Tex. R. App. P. 47.2(b).











[1]  Defense
counsel renewed his earlier objections, and further argued that the
demonstration was Abased on some speculative theory,@ was sponsored by a witness lacking personal
knowledge, and was Aoverly theatrical and overly prejudicial to the Jury.@





[2]  The transcript is less than clear
about the direction of the stabs, but it is later clarified in the following
exchange:

 

The State:        (Ms. Siegler) Neal [Davis, defense
counsel] just wanted me to clarify on the record that when I was making the
stabbing motion at Paul=s chest, the knife was pointed in a
direction where the wounds would have been horizontal to the floor.  Is that right?

Defense:          (Mr. Davis) Well, that you had the
knife, you were holding the knife in your hand as someone would normally hold a
knife.  Except it was palm here, palm was
facing downwards, and she was thrusting downwards to show the wounds were in
the chest area.

The Court:       I think you say it -- the way I observed
it was the sharp part of the blade was facing toward his, say, feet and the
dull part of the blade facing toward the head.

Defense:          That=s more eloquent.  Thank you. I wanted to make sure it was on
the record.  Thank you, Judge.





[3]  Ms. Siegler
instructed Mr. Doyle as follows:

 

The State:          (Ms. Siegler) First of all, Paul, move
your hand up B your left hand up as hard and as high as you can.

(complied)

The State:          That=s as
high as you can go?  Okay.  Move this foot up as high and hard as you
can.

(complied)

The State:          Okay. 
And if I=m sitting on top of you and I=m holding the knife, move your hands up like you=re trying to get me.

(complied)

The State:          That=s all
you can move?

Is that good, Neal?

Defense:            (Mr.
Davis) That=s fine.





[4]  Appellant
requests that this court remand the cause for an out-of-time hearing on her
motion for new trial as alternative relief in the event we do not reverse and
remand for a new trial or punishment hearing.





[5]  The State also
cites Atchison v.
Weingarten Realty Management Co., 916 S.W.2d 74, 76B77 (Tex. App.CHouston [1st Dist.] 1996, no writ), but we do not find that case instructive.  In Atchison, the appellant challenged
the trial court=s grant of summary judgment to the appellee, but the
motion for summary judgment was not included in the record.  A document purporting to be the motion for
summary judgment was physically present in the record as an attachment to
another document filed with the court clerk; however, because the court of
appeals could not determine if this was the summary judgment motion actually
filed, it concluded that the motion for summary judgment was not properly made
a part of the appellate record and overruled appellant=s points of error directed to the substance of the
summary judgment ruling.  Id. at
77.  In contrast, no dispute exists here
whether the DVD is actually the one attached to appellant=s motion for a hearing and new trial. 





[6]  Appellant also
contends the State has waived its complaint because it did not object to
appellant=s motion to supplement the record with the DVD or to
this court=s order granting the motion.  To preserve error, the State needed to object
when appellant asked this court to look at and consider the DVD; appellant first
requested this in her appellate brief, not in the motion to supplement.





[7]  In fact,
neither party contends, and we are aware of no authority so holding, that an
in-court demonstration is reviewable on appeal only if captured on video. 





[8]  Rule 602
provides in relevant part: AA witness may not testify to a matter unless evidence
is introduced sufficient to support a finding that the witness has personal
knowledge of the matter.  Evidence to
prove personal knowledge may, but need not, consist of the testimony of the
witness.@  Tex. R. Evid. 602.





[9]  Rule 701
provides as follows: AIf the witness is not testifying as an expert, the
witness= testimony in the form of opinions or inferences is
limited to those opinions or inferences which are (a) rationally based on the
perception of the witness and (b) helpful to a clear understanding of the
witness= testimony or the determination of a fact in issue.@  Tex. R. Evid. 701. 





[10]  Detective Reynolds testified that
he had worked for the Harris County Sheriff=s Department for over twenty years, had been a detective
for twelve years, and had been assigned to the Homicide Division for ten years,
where he had been involved in investigating hundreds of homicides. 





[11]  AInference@ has
been defined as  A[a] conclusion reached by considering other facts and
deducing a logical consequence from them@ and A[t]he process by which such a conclusion is reached.@  Black=s Law Dictionary 793 (8th ed. 2004).





[12]  The medical
examiner who performed the autopsy on Jeff=s body
agreed with Detective Reynolds= conclusions, testifying that the presence of the
ligatures and the fact that almost all of the stab wounds were on the front of
the body indicated that Jeff Wright was restrained and was face-to-face with
his killer.  However, appellant points
out that the medical examiner also testified that Jeff Wright=s body had wounds on the hands that were consistent
with defensive wounds, and he could not have gotten defensive wounds if his
hands were tightly tied to the bed.  Appellant also cites Detective
Reynolds= admission that he did not see any
bruises on Jeff Wright=s wrists or ankles consistent with
him struggling with the ligatures as depicted in the demonstration.  However, such conflicts go to the weight of
the evidence, not its admissibility.  See
Valdez, 776 S.W.2d at 168; Cantu, 738 S.W.2d at 255.





[13]  See Cantu
v. State, 738 S.W.2d 249, 255 (Tex. Crim. App. 1987) (en banc) (trial court
properly refused to permit in-court demonstration to simulate lighting in room
where murder occurred when differences between actual room and courtroom would
affect crucial element of illumination); Fort Worth & Denver Ry. Co. v. Williams, 375 S.W.2d 279, 281B82 (Tex. 1964) (finding reversible
error in demonstration of filmed experiment to show light beam cast by
locomotive, when position of lights, distances, and other matters was unclear
and there was no evidence of candlepower of light); Ginther v. State,
706 S.W.2d 115, 119 (Tex. App.CHouston [1st Dist.] 1986, pet. ref=d) (holding trial court properly
excluded video reenactment of arrest to show evidence would have blown out of
vehicle when it failed to show position of vehicle=s window and thus did not address
crucial element of air disturbances); Ford Motor Co. v. Nowak, 638
S.W.2d 582, 590 (Tex. App.CCorpus Christi 1982, writ ref=d n.r.e.) (holding admission of
filmed experiment of test vehicle to show design defect was error when
plaintiff failed to show test vehicle had same characteristics as plaintiff=s car); United States v. Gaskell, 985 F.2d 1056, 1060 (11th Cir. 1993) (holding expert=s demonstration of shaken baby syndrome using infant
mannequin was not substantially similar when mannequin had to be shaken harder
than in real life and number of oscillations of head needed to cause injury was
unknown); Carson v. Polley, 689 F.2d 562, 579 (5th Cir. 1982) (holding
it was error to admit Asimilar@ type
knife allegedly found on plaintiff when it was not made clear admission was
solely for illustrative purposes and therefore was prejudicial); McGuire v.
Nelson, 508 P.2d 558, 562 (Mont. 1993) (holding it was reversible error to
permit in-court demonstration using furniture clamp applied to motorcycle to
simulate force exerted by two riders when no evidence showed that force of
clamp was similar to force of riders); State v. Trahan, 576 So.2d 1, 8
(La. 1990) (holding videotape reenactment had no probative value when
position of victim, which was crux of reenactment, was inconsistent with
testimony); State v. Philbrick, 436 A.2d 844, 859B60 (Me. 1981) (holding detective=s demonstration using front seat and dashboard of car
and mannequins to depict shooting was not substantially similar and overly
prejudicial when car parts had been altered and their original positions were
not verified, the mannequins were not shown to be physically similar to the
defendant or the victim, and the detective was not qualified to opine as an
expert on blood spatter evidence forming part of his opinions).





[14]  Appellant also argues the
demonstration was inaccurate because Detective Reynolds testified that he did
not know whether appellant and Jeff Wright were clothed, while in the
demonstration, both participants were clothed. 
However, whether appellant and her husband were dressed is not an
important aspect of the case, and portraying them clothed actually inured to
appellant=s benefit.  See Hayes v. State, 85 S.W.3d 809, 815
(Tex. Crim. App. 2002) (en banc) (stating that, in determining whether
photograph of victim is unfairly prejudicial, reviewing court considers whether
the body depicted is nude or clothed).  





[15]  Appellant relies heavily on Lopez
v. State, in which the Fort Worth Court of Appeals expressed its concern
about the trial court=s admission of a videotaped
reenactment of the appellant=s alleged participation in a marijuana transaction:  

 

While videotape recreations of
criminal activities may be acceptable in some jurisdictions, the concept of
recreating human events with the use of actors is a course of conduct that is
fraught with danger.  The general
appearance of an actor, his facial expression or slightest gesture whether
intended or not may sway a juror who has listened to lengthy testimony.  The danger of jurors branded with television
images of actors, not testimony, is too great to ascertain.  No court instruction could remove highly
prejudicial evidence of a re‑enacted rape or murder if we establish this
precedent.

 

651 S.W.2d 413, 414B15 (Tex. App.CFort Worth 1983), rev=d and remanded on other grounds, 664 S.W.2d 85 (Tex. Crim. App.
1983) (quoting People v. Dabb, 197 P.2d 1, 5 (1948)).  Concluding that admitting the videotape was
error, the court cautioned: 

 

We find that any staged, re-enacted
criminal acts or defensive issues involving human beings are impossible to
duplicate in every minute detail and are therefore inherently dangerous, offer
little in substance and the impact of re-enactments is too highly prejudicial
to insure the State or the defendant a fair trial.

 

Id. at 416.  The Court of Criminal Appeals has commented
that it agrees in principle with the concerns expressed in Lopez.  See Miller v. State, 741 S.W.2d 382,
388 (Tex. Crim. App. 1987) (en banc). 
However, as appellant admits, the Court of Criminal Appeals= comment was dicta because the
claim was not preserved.  Moreover, any
precedential value Lopez may have is limited because the opinion on
original submission was withdrawn and the
appellant=s conviction was reversed on other grounds.  See Lopez v. State, 667 S.W.2d 624,
625 (Tex. App.CFort Worth 1984, no pet.).





[16]  The first five
paragraphs of the article read as follows:

 

Kelly Siegler knows where to draw the line.

 

During a recent notorious murder trial, she knew it
would make good courtroom drama to drag in a bloody mattress, tie her fellow
prosecutor down and straddle him to illustrate how she believes a young mother
killed her husband with 193 stab wounds.

 

But she also knew to limit her demonstration to just a
few hypothetical jabs of the knife, following her gut feeling for what makes a
box of 12 jurors skeptical.

 

AIf I had climbed up on the bed and tried to stab him
193 times, that wouldn=t have worked,@ she
explained last week, several days after securing a murder conviction and
25-year sentence for Susan Wright.

 

AFirst of all, we don=t know
where she stabbed first.  We don=t know when she stopped and took a break.  We don=t know
how the penis slices came in the middle of all this.  I didn=t go
that far because I wasn=t sure how that happened.@

 

Andrew Tilghman, >Pushy= Wright Prosecutor knows Drama, Houston
Chronicle, March 13, 2004.