Ruben CANTU, Appellant,

v.

The STATE of Texas, Appellee.

No. 69530.

Court of Criminal Appeals of Texas, En Banc.

Feb. 4, 1987.

Andrew W. Carruthers, San Antonio, for appellant.

Sam D. Millsap, Jr., Dist. Atty., and Bruce Baxter, Bill Harris and Barbara Hervey, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

A jury convicted appellant of capital murder and answered the punishment issues affirmatively. In accordance therewith, the court sentenced appellant to death. See Art. 37.071, V.A.C.C.P. Appellant raises six grounds of error, two of which deal with the identification of appellant by a prosecution witness. We turn to these grounds first.

Appellant contends that the out-of-court identification made by Juan Moreno was the result of suggestive procedures employed by the police and created a substantial likelihood of mistaken identification. Therefore, he argues that the in-court identification made by Moreno was tainted and should not have been admitted. He argues that such admission violates his rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

Eusebio Moreno testified that on November 8, 1984, he owned and had built a house located at 605 Briggs Street in San Antonio. His brother, Juan Moreno, and his brother-in-law, Pedro Gomez, were sleeping in the house at night because burglars had stolen some things previously while the house was being worked on.

Juan Moreno testified that on November 8, 1984, he was awakened sometime after 10:30 p.m. by appellant poking him with a rifle. The one light in the room was on when he awoke and saw appellant and his co-defendant. He recognized both men because he had seen them two or three times before in the neighborhood when he was working on the house. Appellant told Juan and Gomez to sit on Gomez's bed, and, pointing the rifle at them told them to give appellant and his co-defendant their watches. They also took Gomez's wallet. Appellant then told Gomez to pull back the mattress. Eusebio had left a pistol wrapped in rags under the mattress. As Gomez pulled back the mattress, appellant told him to give him the rag. Before Gomez could do so, appellant shot him in the head once and then shot him eight more times after he fell, killing him. Appellant then shot Juan several times in the head, neck, and chest. Juan survived the shooting.

Detective James Herring testified that he and Detective John Rivas visited Juan in the hospital on November 14 and showed him some photographs. At that time the police knew only that the suspect lived in the neighborhood where the murder had occurred. Appellant was not among the people pictured in the photographs Herring showed to Juan. Juan did not identify anyone in the photographs.

On December 16, Herring again visited Juan. Juan told the police that one assailant was between 18 and 20 years of age and the other was about 13 or 14 years old. Herring and Detective Ricardo Garza showed Juan five photographs, including a photograph of appellant. Juan said he did not recognize anyone in the photographs. However, both Herring and Garza testified that Juan avoided looking at appellant's photograph, that he "passed it up completely." They said that Juan obviously recognized appellant, but was afraid to identify him. When Garza asked him if he was afraid to identify someone in the photographs, Juan did not answer him.

On March 2, 1985, Detective Santos Caso Ballesa visited Juan at his home. He brought five photographs to show to Juan. The photographs were not the same five that the police had shown to Juan on December 16, but appellant was included in the five Ballesa showed Juan. Ballesa testified that Juan did not identify anyone in the photographs. He said that Juan was visibly shaken and did not want to identify anyone. Ballesa said that Juan told him appellant's name and asked if that were not good enough. Ballesa told him that was not good enough. Ballesa stated that he had the impression that Juan knew appellant by sight and by name, but was afraid for his life if he identified appellant's photograph.

The next day, March 3, Detective Edward Quintanilla went to Juan's house and talked to Juan and his brother. Quintanilla knew that Juan had not identified anyone in the photographs, but felt Juan knew more than he was telling. Juan agreed to follow Quintanilla to the police station to view the photographs again. After looking at the photographs, which were the same ones Ballesa had shown him, Juan looked at the photograph of appellant and told Quintanilla that appellant was the man who had murdered Gomez and had shot him. Juan also stated that he had recognized appellant's photograph before, but was afraid to tell the police. Quintanilla testified that Juan said that he did not know appellant's name.

Juan testified that he had recognized appellant in the photographs that were shown to him on all the occasions. He did not tell the police that it was appellant because he did not want appellant to know where he and his family lived. He was afraid for his life and the lives of his family. He said the police never told him they knew appellant was the one who shot him. He also stated that he knew appellant by sight because he had seen him two or three times before the night of the murder. The night of the murder the light was on in the room and appellant was only a few feet away from him during the entire incident. Juan testified that when he was awakened his eyes had to adjust to the light, but then he could see fine as the light was sufficient to illuminate the whole room. Juan stated that he picked the photograph of appellant because he was the one who shot them. He remembered appellant from the shooting and not from the photographs.

Appellant challenges the in-court identification by Juan, alleging that the out-of-court identification procedures were suggestive and tainted the in-court identification. As appellant notes, *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) requires a two step analysis to determine the admissibility of the in-court identification:

1. The photographic display procedure must be impermissibly suggestive; and
2. The suggestive procedure must give rise to a very substantial likelihood of irreparable misidentification.

Analysis under these steps requires an examination of the "totality of the circumstances" of the particular case under consideration and a determination of the reliability of the in-court identification. See *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons*, supra. See also *Jackson v. State*, 657 S.W.2d 123 (Tex. Cr.App.1983).

■ Turning to the first step of the analysis, we agree with appellant that showing Juan several photographic displays on different occasions, each contain-

ing a photograph of appellant, when Juan has previously not identified appellant is a suggestive procedure. In the instant case Juan was shown photographic arrays on December 16, on March 2, and on March 3. The arrays in March were the same and contained the same photograph of appellant. We note that a different photograph of appellant was used in the December photographic display from that used in the two displays shown to Juan in March. Not every case in which several arrays or displays of a defendant containing different pictures of a defendant are suggestive. It may be necessary to show a witness different pictures because a defendant may have several "different looks", i.e., different ages, clean shaven and bearded looks. Suggestiveness must be determined by the circumstances of each case. There is no showing of how the photograph of appellant included in the December 16th array differed from the photograph included in the March displays. Nor is any contention made in the instant case that the photographs depicted appellant differently and were necessary to permit the witness to view the "different faces" of appellant.

In the abstract, therefore, the procedure of showing Juan several arrays on different occasions, all containing appellant's photograph, is a suggestive procedure. Such procedure tends to highlight a particular defendant since the witness sees the same face repeatedly. Such reoccurrence of one particular face might suggest to the witness that the police think the defendant is the culprit. Cf. *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Therefore, repeated showings of appellant's picture in several arrays was suggestive.

■ The reasons for a need to repeatedly display a particular person's photograph to a witness are circumstances to be considered with the totality of the circumstances of identification. In the instant case, where police are certain a witness recognizes a suspect but fears to identify his photograph, police have little choice but to reshow the photograph as one means, possibly the only means, to acquire probable cause and to identify the suspect. Such need does not, by itself, change a procedure from suggestive to non-suggestive. However, the necessity aspect is weighed and considered under the second step of the analysis.[1]

Given the totality of the circumstances of the instant case we do not think that such suggestive procedure gave rise to a "substantial likelihood of irreparable misidentification." Among the considerations we examine in viewing the totality of the circumstances and the likelihood of misidentification are the five factors set out in *Neil v. Biggers,* supra and reaffirmed in *Manson v. Brathwaite,* supra: (1) opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; (5) and the length of time between the crime and the confrontation. These and other pertinent factors are weighed against the "corrupting effect of the suggestive identification itself." *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253.

## OPPORTUNITY TO VIEW

Juan was awakened by appellant in a room lit by one lamp. After Juan's eyes adjusted to the light, he saw appellant for several minutes while he and Gomez were robbed. Appellant directed several commands at Juan. Juan testified that the lighting was sufficient in which to see appellant. Juan had a good opportunity to view appellant.

1. We note here that fear is a factor to be considered in cases such as the instant one where a witness obviously recognizes the defendant but fears to identify the defendant. The necessity to repeatedly show the witness a photograph of the defendant is evident, especially where the defendant is not in custody. When admission of out-of-court identification is challenged such suggestive procedure must be viewed in light of considerations such as this. Cf. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *Simmons,* 390 U.S. at 384–385, 88 S.Ct. at 971.

## DEGREE OF ATTENTION

This is not the case of a casual observer to a crime. Juan was awakened by appellant poking him with a rifle. Appellant directed several commands at Juan, which Juan obeyed. Juan's attention was focused on appellant as appellant robbed Gomez and Juan and then shot Gomez before shooting Juan. Appellant pointed a rifle at Juan throughout the incident. Juan paid appellant almost total attention during the incident.

## ACCURACY OF DESCRIPTION

Juan gave police a fairly general description of appellant and appellant's co-defendant when the police visited him in the hospital on December 16. Juan described appellant as a Latin male, between 18–20 years of age. He said appellant had been wearing bluejeans. The description was accurate as far as it went. However, it was a very general description.

## LEVEL OF CERTAINTY

Juan demonstrated uncertainty in identifying appellant insofar as he did not identify appellant in the December 16 and March 2 photographic displays. He did identify appellant in the photographic array shown to him on March 3, which was the same as the one shown to him on March 2. The officers' testimony and Juan's testimony explains that this "uncertainty" was due to Juan's fear of appellant. Juan testified that he recognized appellant in the photographs from his viewing of appellant on the night of the shooting. He also said he recognized appellant because he had seen him a couple of times before in the neighborhood. He also knew that appellant lived in the neighborhood. The police officers also testified that when Juan viewed appellant's photograph in the various arrays, appellant hesitated or did not look at appellant's photograph. They all characterized his reaction as one of recognition of appellant and fear to identify him. We find that the "uncertainty" displayed by Juan in not identifying appellant is adequately accounted for by Juan's testimony of his fear of appellant and the police offi-cers' testimony that they thought Juan recognized appellant but was afraid to say so. This is further substantiated by Juan's testimony that he had seen appellant on previous occasions and that he remembered appellant from the shooting, not the photographs.

## TIME BETWEEN CRIME AND CONFRONTATION

This factor, like the one just discussed, must be viewed in light of the evidence of Juan's professed fear to identify appellant. Juan first saw a photographic display containing a photograph of appellant on December 16. He did not identify appellant as the perpetrator until March 3. Our discussion of the fourth factor and the consideration of Juan's fear along with his testimony that he recognized appellant apply to this factor also. Because of these considerations the time element is not a critical factor in the instant case.

## OTHER CONSIDERATIONS

Other circumstances of the case that must be considered are those mentioned in conjunction with the enumerated factors above. Juan's failure to promptly identify appellant is balanced by the explanation for such reluctance—his fear for his life and the lives of his family if he identified appellant. The officers who participated in the photographic displays to Juan all noticed his obvious fear when he saw appellant's picture in the group. Such evidence tempers the danger in the suggestive procedure with the photographic displays. Add to this Juan's unwavering testimony that he knew appellant by sight, that he had ample opportunity to view him the night of the shooting, and that he identified appellant because appellant was the one who had shot Gomez and him.

Reviewing the factors we find that Juan had sufficient opportunity to view appellant on the night of the shooting. There was a light in the room and appellant directed the events. Juan, as a victim, focused his attention on appellant. Appellant ordered him to do several things and was

clearly in charge. Certainly Juan's failure to give a detailed description of appellant weighs against him. However, given his obvious fear to identify appellant and his testimony that he had seen appellant in the neighborhood prior to the shooting, and his unwavering testimony that he picked the photograph of appellant and identified appellant at trial because he remembered him from the night of the shooting, we find that the in-court identification was independent of the photographic displays and was based upon Juan's recollection of the shooting. We find that the totality of the circumstances of the case including the out-of-court identification did not create a substantial likelihood of mistaken identification. Appellant was not denied due process of law under the Fourteenth Amendment to the United States Constitution. The in-court identification was properly admitted. The ground of error is overruled.

Appellant's ground of error number three contests the sufficiency of the evidence to support his conviction because the identification testimony was improperly admitted. Having found the identification testimony to have been properly admitted, we overrule appellant's third ground of error.

■ In his fourth ground of error appellant contends that the trial court erred in admitting medical testimony about Juan's injuries sustained in the shooting. Captain Samuel J. Peretsman, a medical doctor, testified to the direction, the path, and the damage caused to Juan by the multiple bullet wounds he suffered. Before Peretsman testified, appellant objected to his testifying, arguing that such testimony was inflammatory, prejudicial and introduced evidence of an extraneous charge. The State responded that the testimony was relevant to show the context of the offense and to show the "continuing basis" of the robbery and murder of the deceased.

Appellant relies on *Fowler v. State*, 352 S.W.2d 838 (Tex.Cr.App.1962) and *Reynolds v. State*, 372 S.W.2d 540 (Tex.Cr.App. 1963) for his contention that details of Juan's injuries should not have been admitted. These cases were overruled on that point by *Levell v. State*, 453 S.W.2d 831 (Tex.Cr.App.1970).

As the State notes, Juan testified without objection, and properly so, that he was shot nine times during the commission of the crime. He also showed his chest to the jury, displaying the wounds located thereon. Peretsman testified to the multiple wounds, their location, and the internal damage the bullets inflicted. Except for the testimony about the internal injuries, Peretsman's testimony was essentially redundant as to the injuries sustained by Juan. This information was already properly before the jury through Juan's testimony describing them as part of the context of the offense. Cf. *Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App.1986). In light of the strength of the evidence of appellant's participation in the commission of the crime, there is not a reasonable possibility that Peretsman's testimony about the internal damage resulting from the bullets, contributed to appellant's conviction. The error, if any, in admitting that part of Peretsman's testimony is harmless. The ground of error is overruled.

■ In his fifth ground of error appellant argues that the trial court erred in refusing to allow the defense to perform an experiment or demonstration concerning lighting. Juan testified that the room in which the murder occurred was lighted by a lamp with either a sixty watt bulb or a seventy-five watt bulb. During the trial appellant sought to simulate the lighting as it had been in the room where the murder occurred. The trial court refused to allow appellant to turn out the lights in the courtroom and demonstrate the amount of light that emanated from a lamp which appellant showed was similar to the lamp in the room at the time of the murder. The trial judge noted that "the problem is that [the courtroom] is not at all like the surroundings and the conditions that existed on November 8 of '84." Specifically, the judge noted that the height of the walls, the width of the room and even the color of the walls were different from the room in which the murder occurred. All these conditions would affect the degree of illumination.

To be admissible, an experiment must be conducted under conditions which are similar to the event to be duplicated. *Ginther v. State*, 672 S.W.2d 475 (Tex.Cr.App.1984); *Brown v. State*, 657 S.W.2d 143 (Tex.Cr. App.1983). The conditions need not be identical as dissimilarities affect the weight and not the admissibility of the evidence. *Aliff v. State*, 627 S.W.2d 166 (Tex.Cr.App. 1982). The trial court has discretion to admit or exclude experiments. Our review is limited to whether or not the judge abused his discretion. When the "facts presented affirmatively show that the proposed experiment was conducted under substantially similar circumstances and conditions, the court abuses its discretion in excluding the evidence. See *Hodge v. State*, 60 Tex.Cr.R. 157, 131 S.W. 577 (1910); *Speers v. State*, 55 Tex.Cr.R. 368, 116 S.W. 568 (1909); *Clark*, supra." *Ginther*, 672 S.W.2d at 477.

In the instant case the experiment was not substantially similar to the actual event. As the trial judge noted, the size of the room and the color of the walls were not the same. For an experiment designed to show the amount of illumination cast by a lamp in a dark living room of a house, such factors are critical.[2] The trial judge did not abuse his discretion in refusing to allow the experiment to be conducted in the courtroom. The ground of error is overruled.

■ Appellant contends that the trial court erred in refusing to permit him to testify for the limited purpose of rebutting evidence of an extraneous offense offered by the State at the punishment phase of the trial. At the punishment phase, the State offered evidence that appellant had shot a police officer. After the State presented this evidence, appellant sought to take the stand and testify before the jury only as to facts involving rebuttal of the State's evidence of the shooting of the police officer. He sought to limit the State's cross-examination of himself to facts involving this extraneous offense. Appellant claimed that he should not be required to relinquish his right against self-incrimination under the Fifth Amendment to the United States Constitution and under Article 1, Section 10 of the Texas Constitution. The trial court overruled appellant's request, stating that if appellant wished to testify before the jury he would be subject to the same rules as any other witness in that he might be contradicted, impeached, and cross-examined on new matters, essentially on all matters relevant to punishment issues in a capital murder trial. This included the facts of the offense for which appellant had just been found guilty. See Article 37.071(b)(1) & (3). Appellant did not testify before the jury at the punishment phase.

The general rule is that if a defendant exercises his right to testify he is subject to the same rules governing examination and cross-examination as any other witness, whether he testifies at the guilt-innocence stage or at the punishment stage of the trial. *Brown v. State*, 617 S.W.2d 234 (Tex.Cr.App.1981). "He may be contradicted, impeached, discredited, attacked, sustained, bolstered, made to give evidence against himself, cross-examined as to new matter, and treated in every respect as any other witness testifying, except where there are overriding constitutional or statutory prohibitions." (citations omitted). *Brown*, 617 S.W.2d at 236. Appellant contends that there are overriding constitutional prohibitions in his case and he cites *Brumfield v. State*, 445 S.W.2d 732 (Tex. Cr.App.1969) as support for his contention. He claims he had to "sacrifice his right to due process, i.e. offering evidence of self defense [as to the extraneous offense] to retain his Fifth Amendment right."

*Brumfield*, supra, is inapplicable to the instant case. *Brumfield* did not involve a defendant who sought to take the stand and limit his testimony. Rather, the de-

---

**2.** We note that appellant's attorney objected to the State performing the same experiment with a bulb of different wattage. Appellant argued that it would be "virtually impossible" for the State to create the same type of situation due to the difference in the windows, the height and width of the walls, and the color of the walls. That is precisely why the trial judge refused to allow appellant to perform the same experiment.

fendant in *Brumfield* sought to invoke his right against self-incrimination by not taking the stand at the punishment stage. The opinion discussed the bifurcated trial system and held that a defendant's waiver of his privilege of self-incrimination by testifying at the guilt-innocence stage does not mean he waived his privilege at the separate punishment stage. Therefore, the State could not compel him to testify at the punishment stage. However, in *Brumfield*, this Court noted that if the defendant takes the stand at the hearing on punishment, "he is on for all purposes of such hearing. *Santiago v. State*, Tex.Cr.App. [(1969)], 444 S.W.2d 758." *Brumfield*, 445 S.W.2d at 740. *Brumfield* is no support for appellant's contention.

*Franklin v. State*, 606 S.W.2d 818 (Tex. Cr.App.1979), also relied upon by appellant, is likewise inapplicable. In *Franklin*, the defendant was cross-examined about his failure to have mentioned his claim of self-defense at pre-trial hearings at which he testified. This questioning was improper because it violated his right against self-incrimination. The pre-trial matters were not relevant to his claim of self-defense and pre-trial hearings, held out of the presence of the jury, are held on specific issues and a defendant has a right not to incriminate himself at trial by not testifying on specific matters dealt with in pre-trial hearings. Again, there was no attempt in *Franklin* to limit the defendant's testimony at trial before the jury to a specific issue. *Franklin* has no bearing on the instant case.

This is a case, like many cases, where a defendant has a very difficult choice to make: should he waive his right against self-incrimination on all relevant issues, knowing some unfavorable evidence might result from cross-examination; or should he retain that right and yet not put his version of some aspect of the case before the jury. A defendant with a criminal record upon which he can be impeached faces the same difficult decision. Should he testify at guilt-innocence and deny his guilt, knowing that the State can then impeach him with prior crimes; or should he simply seek to retain his right against self-incrimination and attempt to discredit the State's case in other ways? This difficult decision does not impose an impermissible burden upon the exercise to Fifth Amendment rights. No constitutional violation is presented by the fact of a difficult decision for a defendant. Appellant's due process rights are not violated. He must weigh the benefits of presenting his case against the detrimental possibilities that cross-examination on all relevant issues might present.

In *Crampton v. Ohio*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) vacated on other grounds, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972), the United States Supreme Court addressed a defendant's claim that his right against self-incrimination was unconstitutionally burdened by the unitary trial procedure utilized by the State of Ohio. The defendant wished to testify on the issue of punishment, but could not do so without also surrendering his right against self-incrimination as to guilt-innocence. The Court noted that the criminal legal process is "replete with situations requiring 'the making of difficult judgments' as to which course to follow." *Crampton*, 402 U.S. at 213, 91 S.Ct. at 1470. The Court then stated:

> The narrow question left open is whether it is consistent with the privilege [Fifth Amendment right against self-incrimination] for the State to provide no means whereby a defendant wishing to present evidence or testimony on the issue of punishment may limit the force of his evidence (and the State's rebuttal) to that issue. We see nothing in the history, policies, or precedents relating to the privilege which requires such means to be available.
>
> \* \* \* \* \* \*
>
> It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination.
>
> \* \* \* \* \* \*
>
> We conclude that the policies of the privilege against compelled self-incrimination are not offended when a defendant in a

capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt. *Crampton,* 402 U.S. at 213–217, 91 S.Ct. at 1470–1472.

*Crampton,* supra, was, like the instant case, a capital murder case. The issue was almost identical. See also *Jenkins v. Anderson,* 447 U.S. 231, 236 n. 3, 100 S.Ct. 2124, 2128 n. 3, 65 L.Ed.2d 86 (1980); and *Brown v. United States,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). The trial court properly overruled appellant's request to limit his testimony, both on direct-examination and cross-examination, to evidence relating to the extraneous offense before the jury at the punishment phase of the trial. The ground of error is overruled.

In his last ground of error appellant contends the trial court erred when it denied appellant's request for a free transcription of specific pre-trial testimony. On July 17, 1984, appellant filed a motion requesting transcription of the pre-trial testimony of Juan Moreno and Ramiro Reyes. The record contains the trial judge's order, dated July 17, 1984, granting appellant's motion. There is nothing in the record to show that appellant did not receive such transcription.[3] No error is presented.

The judgment is affirmed.

CLINTON, MILLER and DUNCAN, JJ., concur in the result.

---

**3.** Appellant also alleges that the trial court denied his motion for a free transcription. However, the record reflects that the trial court granted his motion.