**Affirmed and Memorandum Opinion filed December 5, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00601-CR

**ANTHONY DEWAYNE GREEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 78th District Court**
**Wichita County, Texas**
**Trial Court Cause No. 49480-B**

## M E M O R A N D U M   O P I N I O N

Appellant Anthony DeWayne Green appeals his conviction for aggravated robbery, asserting that the trial court abused its discretion by denying his motion for mistrial, by not instructing the jury on his involuntary statements to investigators, by admitting his in-court identification, and in admitting certain evidence at trial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Green was charged by indictment with two counts of aggravated robbery and one count of aggravated assault. The indictment also contained an enhancement paragraph, alleging a prior conviction. Green pleaded "not guilty" to the charged counts.

At trial, Alex Barnes testified that he was in a parking lot of an apartment complex when a gold vehicle drove up with four individuals inside. The driver of the vehicle accused Barnes of damaging the gold vehicle by "spitting rocks" several days before as Barnes drove from a store parking lot in an attempt to race another vehicle. Barnes denied intentionally damaging any vehicle but the driver pointed a gun at him and then drove away. Barnes notified law enforcement officers of the incident.

Cynthia Torres was outside her apartment the evening of the incident and observed the confrontation between the driver of the gold vehicle and Barnes. Later in the evening, she was inside an apartment with others when a black male with a black handgun entered the apartment and shot two people, Ronald Paschal and C.B., a fourteen year old boy. The gunman, who was accompanied by at least one other person, demanded money and took the teenager's shoes before fleeing. Responding officers on the scene learned from Torres that the gunman was the driver of the gold vehicle that was involved in the incident with Barnes earlier in the evening. Barnes and Torres provided descriptions of the gold vehicle and the gunman to the officers. Others also provided descriptions of the gunman to the officers.

Law enforcement officers pursued and stopped a vehicle matching the descriptions provided and took two black males into custody. Officers observed a pair of shoes with blood on them in the backseat of the vehicle; the shoes matched

2

the description of the shoes taken from the apartment. Green, the driver, waived his statutory and constitutional rights and gave a statement to officers. After the interview, officers collected Green's clothing as potential evidence. The clothing and shoes tested positive for the presence of blood from each of the people shot in the apartment.

Officers compiled photographic lineups, some of which included Green's photograph. Torres was unable to identify anyone from three different photographic line-ups presented on the night of the shooting. Two days later, she identified Green as the gunman from a fourth photographic line-up. Although Barnes did not identify any person matching the gunman's description in an initial photographic line-up on the night of the incident, Barnes later identified Green as the driver in a second photographic lineup two days later. After these identifications were made, officers arrested Green.

At trial, both Barnes and Torres identified Green in court as the gunman they encountered. A female co-defendant, who was with Green during both incidents, testified, and the apartment occupants and other witnesses testified and described the gunman. Green's clothing was admitted into evidence.

The jury found Green guilty as charged. Green pleaded "true" to the enhancement provision. He was sentenced to a life of confinement on each of the aggravated robbery counts and sixty years' confinement for the aggravated assault count; the sentences were to be served concurrently. Green now appeals his conviction.[1]

---

[1] Green initially appealed to the Second Court of Appeals in Fort Worth. Pursuant to its docket equalization authority, the Texas Supreme Court transferred Green's appeal to this court. *See* Tex. Gov't Code Ann. § 73.001

## ISSUES AND ANALYSIS

## A. Did the trial court err in denying Green's motion for mistrial?

In his first issue, Green asserts that the trial court abused its discretion in denying Green's motion for mistrial. Green based his motion for mistrial on the trial court's admonishments to the jury concerning counsels' objections. During trial defense counsel began to object to the admission of certain evidence when the prosecutor asked for the jury to be removed from the courtroom if defense counsel was going to make some "long winded" objection. Before dismissing the jury, defense counsel objected to the prosecutor's side bar remark "long winded" and requested the court to instruct the jury to disregard the remark. The trial court instructed the jury to disregard the remark "regarding long-winded." While the jury was still in the courtroom, the prosecutor continued to object to defense counsel continually making speaking objections. The prosecutor noted that objections must be promptly made and that defense counsel's speaking objections were against local court rules and the rules of evidence. The jury exited the courtroom, and Green moved for mistrial based on the State's attempt to prejudice the jury against Green by implying his counsel was making improper objections. The trial court overruled the motion.

The jury returned to the courtroom, and, at a later bench conference, Green renewed his motion for mistrial, which the trial court overruled. The trial judge indicated that he would admonish the jury "as previously indicated." The trial court then admonished the jury and instructed them to ignore the parties' earlier comments and conversations, likening the adversarial proceedings to an arm-wrestling match. The trial judge instructed the jurors: "So with regard to the type of objections that are being made by [defense counsel], just let that pass by." Green did not object to this admonishment at the time, and the trial continued.

4

Later during trial, outside of the jury's presence, Green's counsel referred to the judge's previous admonishment and argued that the jury could have construed the remark to mean that defense counsel's objections would be ignored. The trial court stated for the record that he intended to instruct the jury to ignore remarks made about objections. The trial court offered to correct any misimpression and proposed an admonishment, to which counsel was amenable. When the jury returned, the trial court informed the jury of the parties' entitlement to the unlimited right to make objections to protect their clients' interest and that such matters were just between the trial court and attorneys. The trial judge instructed the jury to form no opinions regarding the form of the parties' objections and he was not upset with either party and had no intention of showing favor to one party or another with respect to objections beyond ruling on an objection. Not satisfied, Green moved for mistrial which the trial court denied.

*1. Standard of Review*

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). A mistrial is an extreme remedy for conduct that is so prejudicial that expenditure of further time and expense would be futile. *Id.* at 77. Only in dire circumstances, where the prejudice is incurable, will a mistrial be required. *Id.* In most cases, an instruction to disregard will cure the prejudicial effect. *Wesbrook v. State*, 29 S.W.3d 103, 115–16 (Tex. Crim. App. 2000); *Wilson v. State*, 7 S.W.3d 136, 148 (Tex. Crim. App. 1999) (providing that when an argument is not particularly egregious, a trial court's instruction to disregard will usually cure the error).

Article 38.05 of the Texas Code of Criminal Procedure provides:

> In ruling on the admissibility of evidence, the judge shall not discuss
> or comment upon the weight of the same or its bearing in the case, but

5

shall simply decide whether or not it is admissible; *nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case*.

Tex. Code Crim. Proc. Ann. Art. 38.05 (West 1979) (emphasis added). A trial judge must refrain from making any remarks calculated to convey an opinion of the case to the jury so that jurors do not interpret the trial judge's conduct or language as offering a perspective of the merits or the issues involved. *See Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003).

To constitute reversible error, a comment must have been reasonably calculated to benefit the State or prejudice the rights of the defendant. *See Becknell v. State*, 720 S.W.2d 526, 531 (Tex. Crim. App. 1986). To determine whether a comment is either reasonably calculated to benefit the State or prejudice the defendant, we first determine whether the trial judge's statement was material to the case. *Burge v. State*, 443 S.W.2d 720, 724 (Tex. Crim. App. 1969); *Fletcher v. State*, 960 S.W.2d 694, 701 (Tex. App.—Tyler 1997, no pet.); *Clark v. State*, 878 S.W.2d 224, 226 (Tex. App.—Dallas 1994, no pet.). We consider whether the statement (1) implies approval of the State's argument, (2) indicates any disbelief in the defense's position, or (3) diminishes the credibility of the defense's approach to the case. *Fletcher*, 960 S.W.2d at 701;*Clark*, 878 S.W.2d at 226. Generally, an instruction by the trial judge to disregard any of the judge's comments is sufficient to cure any error. *See Marks v. State*, 617 S.W.2d 250, 252 (Tex. Crim. App. 1981); *Fletcher*, 960 S.W.2d at 701. We consider the consequences that probably resulted from the trial court's comments to determine whether the comments prejudiced Green's rights. *Clark*, 878 S.W.2d at 226.

## 2. *Analysis*

Green's argument for mistrial focuses on the trial judge's admonishment to jurors to "just let that pass by." He characterizes the remark as prejudicial and

biased the jury against Green and his counsel by encouraging the jury to ignore or pay less attention to defense counsel's objections.

The record does not reflect that the trial judge's comment, to "just let that pass by," indicated any approval of the State's arguments or objections, expressed any disbelief of defense counsel's arguments or positions, or diminished the credibility of the defense's approach to the case. *Cf. Clark*, 878 S.W.2d at 226. Accordingly, we cannot conclude that the comment was material to the case and it does not rise to the level of reversible error as being reasonably calculated to benefit the State or to prejudice Green. *See id.* Moreover, the trial court's curative instruction was sufficient to remedy the harm or prejudice, if any, by the comment to "just let that pass by." *See Fletcher*, 960 S.W.2d at 701. We overrule Green's first issue.

## B. Did the trial court err in failing to include in the jury charge an instruction regarding the voluntariness of Green's statements to investigators?

In his second issue, Green asserts the trial court should have charged the jury with an instruction as to the voluntariness of the recorded statement Green gave to investigators. Article 38.22, section 6 of the Texas Code of Criminal Procedure governs the admissibility of an accused's custodial and non-custodial statements and provides that only voluntary statements may be admitted. Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (West 2007); *see Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008). A claim under section 6 that an accused's statement was involuntarily made may include situations involving police overreaching, youth, intoxication, illness or medication, mental incapacitation, or other disabilities. *See Oursbourn*, 259 S.W.3d at 172–73.

Green claims he raised the issue of voluntariness, and that the trial court was on notice of his challenge to the voluntariness of his recorded statement, by

7

evidence that Green had admitted smoking narcotics and consuming alcohol prior to giving his statement. The State concedes error and asserts that Green was entitled to a voluntariness instruction under section 6 of article 38.22. Accordingly, we assume, without deciding, that he was entitled to a voluntariness instruction and consider whether Green has been harmed by the failure to charge the jury on voluntariness.

## 1. Standard of Review

A trial judge has the absolute duty to sua sponte prepare a jury charge that accurately sets out the law applicable to the case. *Id.* at 179–81. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). When, as in this case, statutes such as article 38.22 require an instruction under certain circumstances, that instruction is "law applicable to the case," and the trial court must instruct the jury regarding what is required under the statute. *Oursbourn*, 259 S.W.3d at 180–81. A "voluntariness" issue must be raised by the evidence, and an accused should request a jury instruction that relates to the theory of involuntariness; if the accused fails to present a proposed jury instruction or fails to object to the lack of one, any potential error in the charge is reviewed for egregious harm, as set forth in *Almanza*. *Id.* at 174; *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *overruled on other grounds by Rodriquez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988).

When, as in this case, the defendant fails to request an article 38.22 instruction, or fails to object to the lack of one, we consider the trial court's failure to instruct the jury pursuant to this article as a jury-charge error. *See Oursbourn*, 259 S.W.3d at 174; *Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007). Under this standard, jury-charge error in the absence of an objection or request results in reversal only when egregious harm ensued. *Pickens v. State*, 165

S.W.3d 675, 680 (Tex. Crim. App. 2005). Egregious harm occurs when the defendant has not received a fair and impartial trial. *See Almanza*, 686 S.W.2d at 171. The defendant must have suffered actual harm, rather than merely theoretical harm from the jury-instruction error. *See id.* at 174. We consider whether a defendant has suffered egregious harm stemming from a non-objected-to instruction on a case-by-case basis in light of (1) the entire jury charge, (2) the state of the evidence, including contested issues, (3) arguments of counsel, and (4) any other relevant information. *See Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Errors that result in egregious harm affect "the very basis of the case," "deprive a defendant of a valuable right," or "vitally affect a defensive theory." *See id.*

## 2. *Egregious Harm Review*

Green made a recorded statement that was inconsistent with a statement made by one of the co-defendants. The State referenced Green's recorded statement during closing arguments and argued that Green was not intoxicated and that the statement was voluntarily made. Green's statement, even if it was involuntary, did not contain an explicit confession. But the State presented other overwhelming evidence of Green's guilt including blood from the injured teenager located on the teenager's shoes found in Green's vehicle, testimony of a female co-defendant who witnessed both incidents and corroborated Barnes's and Torres's accounts of the incidents, and eye-witnesses' testimony that identified Green and his vehicle from the incidents. When considering the record as a whole, particularly in light of the other evidence against appellant, Green has not suffered egregious harm because the failure to include an article 38.22, section 6 instruction in the jury charge did not affect the very basis of the case, deprive Green of a valuable right, or vitally affect a defensive theory. *See Stuhler v. State*, 218

9

S.W.3d 706, 719 (Tex. Crim. App. 2007) (defining "egregious harm"). We overrule Green's second issue.

## C. Did the trial court err in admitting in-court identification of Green?

In a third issue, Green asserts that the trial court erred in admitting the in-court identification of Green by two witnesses, Barnes and Torres, who observed both incidents, on the grounds that their identifications were the result of impermissibly suggestive pretrial photographic lineup procedures. An in-court identification is inadmissible if it has been tainted by an impermissibly suggestive pre-trial identification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Williams v. State*, 402 S.W.3d 425, 431 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

### 1. Standard of Review

We consider, under the totality of the circumstances, whether the pretrial photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *See Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008). Because admissibility of identification testimony hinges on reliability, to warrant exclusion of the in-court identification, clear and convincing evidence must establish that the in-court identification was unreliable. *See id.*; *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); *Santos v. State,* 116 S.W.3d 447, 451, 455 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). If the indicia of reliability outweigh the influence of an impermissibly suggestive pretrial identification, in-court identification testimony is admissible. *See Luna*, 268 S.W.3d at 608; *Delk*, 855 S.W.2d at 706.

## 2. *The Lineups*

The record reflects that Barnes viewed at least two photographic lineups. On the night of the incident, Barnes was shown a photographic lineup. Although Barnes testified that he had identified Green from this photographic lineup on January 18, 2010, the night of the offenses, an officer testified that Barnes did not identify Green from that initial photographic lineup on that night. The record reflects an officer's testimony that a photograph of Green at a younger age was in this initial lineup, but this photographic lineup was not admitted into evidence at trial. Barnes recalled identifying Green in a subsequent photographic lineup, though Barnes was unable to recall the correct dates of the lineups. A different officer testified that he compiled a second photographic lineup, State's Exhibit 50, two days after the incident, using a current photo of Green. Barnes positively identified Green from this second lineup as the gunman. The officer testified that although officers could have used an older booking photo in a lineup, investigators use current photos in a lineup to correspond to the date of the offense.

On the night of the offense, Torres was shown three photographic lineups. One of the three lineups, State's Exhibit 103, included an older photo of Green when he appeared to be younger and slimmer; the other two photographic lineups did not contain any photographs of Green. These three photographic lineups were admitted into evidence at trial. Barnes was unable to identify anyone from these three January 18, 2010 photographic lineups. Two days later, Torres was shown another photographic lineup, State's Exhibit 51, in which a more recent photograph of Green was used, and Torres positively identified Green as the gunman in both incidents.

## 3. *Analysis*

As reflected in the record, all of the photographic lineups admitted at trial

appear to share similar compositions of six photographs of individuals with the same or similar race, sex, hairstyles, and builds. Green does not contest the composition of the photographic lineups. Rather, Green asserts that the multiple photographic lineups were impermissibly suggestive because they unfairly highlighted Green's face through repetition. Though it may be necessary in some circumstances to show a witness more than one photograph of a defendant who has "different looks," it is generally considered suggestive to show a witness several photographic arrays or lineups in which only the defendant's photograph recurs. *See Cantu v. State*, 738 S.W.2d 249, 252 (Tex. Crim. App. 1987); *Santos*, 116 S.W.3d at 451–52. The recurrence of an accused's photograph tends to bring attention to him and might suggest to the witness that police believe or suspect the accused is the culprit. *See Cantu*, 738 S.W.2d at 252; *Santos*, 116 S.W.3d at 451–52.

The record does not contain the initial lineup shown to Barnes. Although the State suggests the possibility that this initial lineup could have contained the same older photograph of Green as shown to Torres in State's Exhibit 103, there is no showing of how the photograph of Green in the initial photographic lineup with Barnes differed from the photo lineup, State's Exhibit 50, when Barnes identified Green two days later. *See Cantu*, 738 S.W.2d at 252. The record reflects that the State's Exhibit 103, a prior lineup, contained a different photograph of Green than the one used in the lineup two days later, in which Torres positively identified Green from State's Exhibit 51. *See id.* The two photographic lineups in which Barnes and Torres both positively identified Green, State's Exhibits 50 and 51, contained the same photograph of Green, but his photograph was positioned in a different place in each of the two photographic lineups.[2] In abstract, the officers'

---

[2] Although Green refers in his appellate brief to State's Exhibit 47, that exhibit is one in

12

procedures in showing Barnes and Torres multiple photographic lineups on different occasions, even when a different picture of Green is used in the lineups, might be a suggestive procedure. *See Cantu*, 738 S.W.2d at 252.

However, under the totality of the circumstances, any such suggestive pretrial identification procedures did not give rise to substantial risk of misidentification. *See id.* In determining under the totality of the circumstances the likelihood of misidentification, we consider the witnesses' opportunities to view the criminal at the time of the offense, the witnesses' degree of attention, the accuracy of the witnesses' prior description, the level of certainty demonstrated by the witnesses at confrontation, and the length of time between the offense and the confrontation. *Id.*

Barnes, though he was ten feet away on the ground and underneath a vehicle that he was attempting to tow, had a sufficient opportunity to view Green. The record is not clear how long Barnes' encounter with the gunman lasted, but enough time passed for the two men to engage in a conversation. Testimony differs as to the time of evening or early evening that the incident occurred, and Barnes testified that it was getting dark outside when the incident occurred. Barnes had a heightened degree of attention because he was being held at gunpoint, stating that he wouldn't forget the face of a person who was holding him at gunpoint. Barnes' general descriptions of the gunman, as a black male in dark clothing, and the extremely specific description of the vehicle matched the same descriptions in the apartment shooting and of Green and Green's vehicle. Barnes positively, unequivocally identified Green from the photographic lineup two days after the incident, demonstrating a strong level of certainty. In light of these considerations,

which a person who was shot in the apartment made a positive identification of one of Green's co-defendants. Nothing in the record reflects that it was used to make any identification of Green through the two witnesses of whom Green complains on appeal.

13

any impermissibly suggestive lineup procedures did not create a substantial likelihood of irreparable misidentification by Barnes. *See id.* at 252–53.

Likewise, Torres had sufficient opportunity to observe both incidents. She claimed to have seen the gunman clearly in daylight hours, between 4:00 and 5:00 p.m., when she saw the gunman threaten Barnes in the parking lot. When the gunman entered the apartment in the second incident, Torres claimed to have gotten a good look at his face before she covered her own face as the shots were fired. She estimated that the gunman was in the apartment for less than fifteen minutes. Torres accurately described the gunman, the gun, and the vehicle from the incidents. She had a heightened degree of attention in both incidents and demonstrated a high level of certainty about her description of Green. Torres positively identified Green two days after the incident. *See id.*

Weighing the evidence of reliability against any unduly suggestive procedures used to obtain the identifications of Green, we conclude no substantial risk of irreparable misidentification was created so as to deny Green a fair trial and impartial jury. *See Ibarra*, 11 S.W.3d at 195–96; *Delk*, 855 S.W.2d at 706. Accordingly, the trial court did not abuse its discretion by allowing the Barnes and Torres to make in-court identifications of Green based on the prior out-of-court identifications. *See Cantu*, 738 S.W.2d at 254. We overrule Green's third issue.

## D. Did the trial court err in admitting Green's clothing into evidence?

In his fourth issue, Green asserts the trial court should not have admitted into evidence clothing that officers seized from Green during his non-custodial police interview because the clothes were obtained without his consent. The trial court ruled that Green voluntarily gave the clothing to the officers.

14

*1. Standard of Review*

We review a trial court's ruling on the admissibility of evidence under an abuse-of-discretion standard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Under this standard, we uphold the ruling if it was within the zone of reasonable disagreement. *See id.* To determine the ruling's reasonableness we must examine the evidence surrounding the police custody of Green and how the police obtained Green's clothes.

*2. Search and Seizure*

A Fourth Amendment search or seizure conducted without a warrant or without probable cause is per se unreasonable unless it was conducted pursuant an well-delineated exception, such as voluntary consent. *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011). Whether a person voluntarily consented is a question of fact to be determined on the totality of the circumstances. *Id.* A person's consent can be expressed by words, conduct, or circumstantial evidence showing implied consent. *Id.* We consider under the totality of the circumstances whether Green's will was overborne and his capacity for self-determination critically impaired such that his consent to the seizure of his clothing was rendered involuntary. *Id.*

In order to be voluntary, consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)). Consent must be shown to be positive and unequivocal, and there must not be duress or coercion. *Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991). Voluntary consent is not shown by mere acquiescence, alone, to a claim of lawful authority. *See Meeks v. State*, 692 S.W.3d 504, 509 (Tex. Crim. App. 1985). An officer's failure to inform

the accused that he could refuse consent is a factor to consider when determining the voluntariness of consent; but the absence of such information does not automatically render an accused's consent involuntary. *See Johnson v. State*, 68 S.W.3d 644, 653 (Tex. Crim. App. 2002). We consider the following factors in determining voluntariness: the defendant's age, education, and intelligence; the length of detention; any constitutional advice given to the defendant; the repetitiveness of questioning; and the use of physical punishment. *See Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). We also consider whether the defendant was in custody, handcuffed, or had been arrested at gunpoint, whether *Miranda* warnings were given, and whether the defendant had the option to refuse to consent. *See Cadoree v. State*, 331 S.W.3d 514, 520–21 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). In examining the totality of the circumstances surrounding any alleged consent, the trial court should consider the circumstances before the search or seizure, the reaction of the accused to pressure, and any other factor deemed relevant. *See Reasor*, 12 S.W.3d at 818. Although the federal constitution requires proof of the voluntariness of consent by a preponderance of the evidence, the Texas Constitution requires a showing by clear and convincing evidence that the consent was freely given. *Carmouche*, 10 S.W.3d at 331. If the record supports a finding by clear and convincing evidence that the consent to search was free and voluntary, we will not disturb that finding. *Id.*

### 2. *Green's Consent*

The record reflects that Green was read his statutory and constitutional *Miranda* rights, which he claimed to understand, and he agreed to speak with officers in the interview that lasted less than one hour. Although Green was handcuffed for the interview, he was not under arrest at the time of the interview. An officer removed the handcuffs near the end of the interview when the officer

16

stated that he planned to collect Green's pants, shirt, and shoes for evidence. Green asked about getting the items back, particularly his shoes, but he did not protest the officer's stated intentions or refuse to comply. He cooperated and removed the items himself as requested by the officer. He was given white coveralls to wear. Green was not asked to give consent and was not advised of any right to refuse consent. *See Johnson*, 68 S.W.3d at 653. Although the recorded video of Green's statements is somewhat difficult to understand, the video unmistakably reflects that that as the officer packaged and labeled the items, Green stated, "You can have that s***, man; I don't care about them."

The record reflects that appellant voluntarily consented and agreed to allow the officers to take his clothing and shoes. *See Russell v. State*, 739 S.W.2d 923, 927–28 (Tex. App.—Dallas 1987, pet. dism'd) (providing that blood-stained clothing was properly admitted when accused voluntarily went to police headquarters to converse with officers after she was read *Miranda* rights and consented to a search for evidence related to the offense); *Miller v. State*, 687 S.W.2d 33, 37 (Tex. App.—Corpus Christi 1985), *affirmed*, 736 S.W.2d 643 (Tex. Crim. App. 1987) (concluding that handbag used in commission of offense, among other things, was admissible because the accused voluntarily took officers to his home and voluntarily handed the items to officers even if his arrest was illegal). He was cooperative and the exchange was neither confrontational nor provocative. The record supports a finding that Green's consent was positive and unequivocal, and not mere submission to the officer's claim of lawful authority. The record does not reflect that Green's will was overborne at any point with threats and he did not invoke any *Miranda* rights. Reviewing the record under the prevailing standard, we conclude the trial court did not abuse its discretion in admitting the items into evidence because Green had voluntarily consented to allowing officers

17

to take the items.  *See Miller*, 687 S.W.2d at 37.  *See also Fancher v. State*, 659 S.W.3d 836, 839 (Tex. Crim. App. 1983) (concluding that clothing obtained from an accused's residence was admissible because the residence was owned by the accused's grandparents who consented to a search of the home and the clothing was given freely and voluntarily to the officers by the accused's grandmother). We overrule Green's fourth issue.

## CONCLUSION

We conclude that the trial court did not abuse its discretion in denying Green's motions for mistrial.  Although the trial court erred in failing to include a voluntariness instruction, Green did not suffer egregious harm from such failure. The trial court did not abuse its discretion by allowing in-court identifications of Green based on the prior out-of-court identifications.  Finally, because the evidence supports that Green voluntarily consented to providing his clothing to police, the trial court did not abuse its discretion by admitting the clothing into evidence.

The trial court's judgment is affirmed.


/s/      Rebecca Simmons
Justice


Panel consists of Justices McCally, Busby, and Simmons.[*]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[*] Senior Justice Rebecca Simmons sitting by assignment.