**Reversed and Remanded and Opinion Filed December 31, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01451-CR
### No. 05-13-01452-CR

**STATE OF TEXAS, Appellant**
**V.**
**DAVID RUIZ-HIRACHETA, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-13351, F11-13353**

## OPINION

Before Justices FitzGerald, Fillmore, and Stoddart
Opinion by Justice FitzGerald

Appellee was charged with two aggravated assault offenses arising from the same transaction but involving different victims. A co-defendant, Andres DeLeon-Gloria, was also charged with the same offenses. Counsel for appellee filed a motion to suppress the identification of appellee and DeLeon-Gloria as perpetrators, asserting that the identification was irreparably tainted because the police did not use a photo lineup procedure and improperly influenced the process by which identification of the alleged perpetrators was obtained. DeLeon-Gloria's counsel joined in the motion. The trial court granted the motion to suppress and the State now

appeals the trial court's ruling.[1] In a single issue, the State argues the trial court erred in suppressing the evidence identifying the perpetrators. We reverse the trial court's order.

## BACKGROUND

Troy Moore testified he was half white and half Mexican and spoke and understood Spanish. Just before dark on the night of September 20, 2011, while visiting in a friend's apartment at the Metrocrest Apartments in Carrollton, Texas, Moore observed a Hispanic male lead two black males and one black female to the door of apartment number 246. He saw the Hispanic male and female enter the apartment. The two black males stayed outside, then left, but soon returned to the apartment and entered it after knocking on the door. A few minutes later, Moore saw the female come out and leave, followed in a short time by the two black men, who left running. A group of Hispanics came out of the apartment and chased the two black males.

Moore went to speak with the persons in apartment 246 and learned they had been robbed by the black men. Moore offered to assist the robbery victims by taking them to a vehicle he thought was connected with the robbers. He told them, "I think I found the car. Just follow me, but don't get mad if it's not them."

Moore walked with several of the persons from apartment 246 to the parking lot of a nearby beauty school where there was a single car that Moore identified as the one used by the robbers that evening. A pick-up truck arrived and one of the men with Moore walked over to the truck and stated that this was "the car." The driver of the truck peered into the car and said "it's them" three times.

Two of the men who had walked with Moore from the apartment complex pulled out handguns and began shooting several rounds into the car as it backed up. But the car was not one used by the robbers. The passengers in the car, a man and a woman, were not involved in the

---

[1] The State's appeal is brought pursuant to TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5), (d) (West 2014).

robbery. The victims were wounded by the gunfire and called the police. Moore and the men who had accompanied him ran back to the apartment complex and took off. Moore called his sister, who encouraged him to contact the police. Moore then contacted the police.

The police identified the renter of apartment 246 but learned that she lived several miles from the apartment. Police went to her location and found four Hispanic males that they determined lived in apartment 246. These four individuals were brought to the police station for questioning.

Officer Jason Peattie, a detective with the Carrollton Police Department, testified at the hearing. On September 20, 2011, the day after the incident, Moore was brought to the police station to identify suspects in the investigation. The police escorted him to and from the station.

The Carrollton Police Department has a written policy concerning photo lineups. Peattie testified that the purpose of the procedures is to avoid erroneous eyewitness identification. The procedures require a sequential six-person photo line-up administered by a detective who is not associated with the case. As Peattie explained, a detective involved in the investigation would be aware of who the suspects are. Having an uninvolved detective administer the lineup is to "prevent any possibility of influencing the lineup."

Peattie was involved in the investigation of the incident. When Moore arrived at the station, no lineup was conducted. Peattie testified that there was no lineup because Moore knew where the individuals lived and had been with them at the time of the offense. Consequently, Peattie stated, "we did not feel . . . a six-person lineup was necessary."

Peattie showed Moore a single photograph of two of the four suspects that had been brought into questioning. Although four suspects had been brought in for questioning, Moore was shown only two photographs because they had not yet taken pictures of the other two suspects. Peattie could not recall what he said to Moore when he showed him the photographs,

nor could he recall exactly what Moore said when he viewed the pictures. Peattie testified that Moore "just identified the suspects as the people he had been with the prior night."

Peattie could not recall whether there was a video of a live interview with one of the suspects playing when Moore was escorted into the room. Peattie also could not recall which suspect was being interviewed when Moore was shown the video. Nonetheless, Peattie acknowledged that Moore was shown a video of at least one live interview after he was shown the two still photographs.

The trial judge asked Peattie what he said to Moore when he handed him the two pictures. Peattie stated that he could not recall the exact words, but he was sure it was something like, "Are these the individuals you were with?" The trial judge also asked Peattie what he said when he showed Moore the video. Peattie stated that "viewing the pictures and the video, [he was] asking the witness to state that these people [were] involved in the shooting incident."

Officer Snyder also met with Moore when he came to the station on September 20. Snyder testified that Peattie brought Moore to his desk. A surveillance camera had captured the incident on video, and Snyder had this surveillance video paused on one of his computer screens when Moore was brought to his desk. Snyder showed Moore still shots that had been obtained from the video. In one shot, Moore identified himself as the individual in "the lower right" and the two shooters shoulder-to-shoulder firing at the vehicle. Moore was then shown the entire video, and he identified DeLeon-Gloria and appellee. Snyder did not ask Moore how long he had known these two individuals, and the entire meeting took place in less than five minutes. According to Snyder, there was no hesitation when Moore identified the individuals in the photographs. He did not identify the individuals by name, but instead stated, "this is the guy."

When Moore viewed the surveillance video, the video of the live interviews of DeLeon-Gloria and appellee were displayed on a split screen on another computer in Snyder's cubicle.

–4–

Moore testified he could not recall if he had ever seen any of the individuals in apartment 246 before the night in question. Moore told the people in the apartment that he had followed the robbers' car. He offered to show them the car, but said, "don't get mad if it is not them." Moore did not recall how many people walked from apartment 246 to the parking lot where the car was parked. A truck pulled up and "one of the guys told them the car is right here." The driver of the truck looked into the car and said "it's them" three times. Then, "two guys pulled out their guns, and then the car reversed and that's when they started shooting." After the shooting, everyone ran to the apartments. In back of the apartments, Moore told them to leave because the persons they shot might come back and shoot them. So they got in their cars and left.

When Moore was shown the two pictures he identified at the police station, Moore testified that he had identified them that night, "but to this day, right now, these faces don't look familiar." Moore stated he had no hesitation in identifying the people in the photographs when he was at the police station. Moore stated that when he went over to apartment 246, he stayed outside, but there was enough light to "see who was there." He also said that during the several minutes the group walked over to the parking lot, he was close enough to see with whom he was walking.

Moore testified that he did not know the names of any of the individuals at the apartment. When Peattie showed him the photographs, he said, "are these the two?" Moore also saw the video of the live interviews and told the police "those were the two shooters." Moore recalled seeing a still shot from the surveillance video, and stated that he showed the police that he was standing to the right of the shooters. Moore further testified that he went back to the police station a second time. He does not recall when this occurred in relationship to his first visit to the station. Moore said that he did the same thing again—police showed him the pictures and videos and asked him questions.

–5–

Moore further testified he saw each member of the group in the apartment, on the way to and at the scene of the shooting, and again in back of the apartments, that there was sufficient lighting at each location, and that he was close enough to identify them. He did not hesitate to identify two from their photographs.

By October of 2013, during the suppression hearing, Moore stated that he did not believe he could recognize the individuals in the photographs, and he did not see them in the courtroom. When the hearing concluded, the trial court granted the motion to suppress. The court did not make any findings of fact and conclusions of law.

## ANALYSIS

The State asserts appellee did not meet his burden to establish that the procedure used by the police gave rise to a substantial likelihood of misidentification.

On appeal, we review a trial court's ruling on a motion to suppress evidence based on a claim that an impermissibly suggestive pretrial identification procedure violated the defendant's due process rights under the standard of review set forth in *Guzman v. State*.[2] Under this standard, we afford almost total deference to a trial court's determination of facts, especially when the trial court's findings are based on an evaluation of credibility and demeanor.[3] We afford the same deference to a trial court's determination of mixed questions of law and fact if the resolution of those ultimate questions turns on an examination of credibility and demeanor of the witness.[4] However, a trial court's determination of mixed questions of law and fact that do not turn on credibility and demeanor are reviewed de novo.[5]

---

[2] 955 S.W.2d 85 (Tex. Crim. App. 1997); *see also Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998).

[3] *Guzman*, 955 S.W.2d at 89; *Moore v. State*, 140 S.W.3d 720, 730 (Tex. App.—Austin 2004, pet. ref'd).

[4] *Guzman*, 955 S.W.2d at 89.

[5] *Id*.

A pretrial identification may not be so suggestive and conducive to mistaken identification that subsequent use of that pretrial identification at trial would deny the accused due process of law.[6] Both pretrial identification and potentially tainted in-court identification are evaluated using the same two-step analysis.[7] Under this analysis, we consider: (1) whether the pretrial identification procedure was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification.[8] The defendant must prove both elements by clear and convincing evidence.[9] An analysis of these steps requires an examination of the "totality of the circumstances" surrounding the particular case and a determination of the reliability of the identification.[10] Reliability is the linchpin in determining the admissibility of identification testimony.[11]

With regard to the first prong, it is well established that suggestiveness may arise from the manner in which the pretrial identification procedure is conducted or from the content of the resulting photo array itself.[12] Suggestiveness may arise from the manner in which the pre-trial identification is conducted if, for example, police point out the suspect or suggest that a suspect is included in the photo array.[13] Factors used in evaluating the reliability of a procedure in a given case include the witness's opportunity to observe the defendant, the degree of the witness's

---

[6] *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995) (citing *Stovall v. Denno*, 388 U.S. 293 (1967)).

[7] *See Hernandez v. State*, No. 01-06-00779-CR, 2013 WL 1804436, at *14 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (mem. op., not designated for publication).

[8] *See Barley*, 906 S.W.2d at 33 (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

[9] *Id*. at 33–34.

[10] *Cantu v. State*, 738 S.W.2d 249, 251 (Tex. Crim. App. 1987)

[11] *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

[12] *Barley*, 906 S.W.2d at 33.

[13] *Id.*

attention, the accuracy of prior descriptions, the degree of certainty of the witness with regard to the identification, and the amount of time separating the crime and the confrontation.[14]

In the present case, the first question is whether the identification procedure was impermissibly suggestive. Departmental procedures had been established to safeguard against erroneous eyewitness identification. However, Moore was not shown any type of photo array, apparently because the officer believed Moore was acquainted with the individuals. Instead, Peattie, an officer involved in the investigation, simply showed Moore two photographs and asked whether the individuals depicted had committed the offense. This occurred within 24 hours of the shooting, at a time when the entire event was fresh. Moore was shown the video of the two suspects being interviewed and a surveillance video of the actual shooting as recorded in real time.

The police interview of Moore at which the two photos were viewed occurred close to the time of the offense and, together with the witness's certainty in his identification, tend to support a lack of suggestiveness. The showing of the surveillance video does not detract from the witness's identification. However, in view of only the two suspects' photos being shown to the witness, we conclude the procedure was suggestive. We, therefore, proceed to consider whether the procedure gave rise to a substantial likelihood of misidentification.[15] We use the totality of the circumstances test to determine whether there is a substantial likelihood of misidentification.[16] Factors employed to determine reliability include: the witness's opportunity to observe the defendant, the degree of the witness's attention, the accuracy of the prior

---

[14] *Neil v. Biggers*, 409 U.S. 188, 191 (1972).

[15] *See Barley*, 906 S.W.2d at 33.

[16] *See Manson*, 432 U.S. at 114.

descriptions, the degree of certainty of the witness in regard to the identification, and the amount of time separating the crime and the confrontation.[17]

Moore had the opportunity to view the shooters during the crime. He also had an opportunity to observe these individuals when he spoke with them at the apartment, walked with them from the apartment to the parking lot, and spoke to them again in the back of the apartments before they dispersed. Moore testified that the lighting was sufficient for him to see them in the apartment, as they walked to the parking lot, and again when they talked in back of the apartments. Moore was in close proximity to the shooters when the crime occurred. Moore's identification of the shooters occurred the day after the shooting, when his memory was still fresh. Every time Moore identified the shooters, he did so with a high level of certainty. Peattie, Snyder, and Moore all testified about this high degree of certainty. All of these factors weigh heavily against the likelihood of misidentification. There is no evidence concerning any inaccuracy of any prior descriptions Moore may have given to the police.

It was appellee's burden to establish a substantial likelihood of misidentification by clear and convincing evidence.[18] There is no evidence that detracts from the ability of the witness to identify the perpetrators at the time of the incident, such as poor lighting conditions, limited visibility, significant distances involved, or a short time period during which the witness had the opportunity to observe the individuals.

---

[17] *Biggers*, 409 U.S. at 199–200.

[18] *See Barley*, 906 S.W.2d at 33.

On this record, we conclude appellee failed to meet his burden. Accordingly, the trial court erred in granting the motion to suppress. The State's issue is sustained. The trial court's order is reversed.

Do Not Publish
TEX. R. APP. P. 47
131451F.U05

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

STATE OF TEXAS, Appellant

No. 05-13-01451-CR     V.

DAVID RUIZ-HIRACHETA, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-13351.
Opinion delivered by Justice FitzGerald.
Justices Fillmore and Stoddart participating.

Based on the Court's opinion of this date, the order of the trial court granting appellee David Ruiz-Hiracheta's motion to suppress is **REVERSED** and the cause **REMANDED** for further proceedings consistent with this opinion.


Judgment entered December 31, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

STATE OF TEXAS, Appellant

No. 05-13-01452-CR        V.

DAVID RUIZ-HIRACHETA, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-13353.
Opinion delivered by Justice FitzGerald.
Justices Fillmore and Stoddart participating.

Based on the Court's opinion of this date, the order of the trial court granting appellee David Ruiz-Hiracheta's motion to suppress is **REVERSED** and the cause **REMANDED** for further proceedings consistent with this opinion.

Judgment entered December 31, 2014.